# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

LATOYA SINGLETON, as Personal
Representative of the Estate of
SHAMEELAH CHAMBERS, Deceased,

                Plaintiff,

v.

CITY OF DETROIT, a Michigan
Municipal Corporation, WELLPATH,
LLC, a Foreign Limited Liability
Company, GRAND PRAIRIE
HEALTHCARE SERVICES, P.C.,
a Foreign For-Profit Corporation,
OFFICER RAFAEL PIERCE, OFFICER
JAMES CORSI, DETENTION FACILITY
OFFICER (DFO) THOMAS, DFO LATANYA
WASHINGTON, DFO AMEEKA FRAZIER,
DFO K. RUDOLPH, LT. F. BOWENS,
LT. R. GILMORE, LT. KING, LT. V. HAYES,
LT. K. WALTON, LT. M. FENN, SGT. R.
PHILLIPS, CAPT. BLOCKETT, BOOKING
OFFICER J. DOE, DFO J. DOES 1 – 5,
INTAKE NURSE JANE/JOHN DOE, in their
Individual Capacities, Jointly and Severally,

                Defendants.

Case No.
Hon.

**COMPLAINT AND
JURY DEMAND**

---

JAMES J. HARRINGTON (P65351)
JENNIFER G. DAMICO (P51403)
Fieger, Fieger, Kenney &
Harrington, P.C.
*Attorneys for Plaintiff*
19390 West Ten Mile Road
Southfield, MI 48075
(248) 355-5555/(248) 233-3521 Fax
j.damico@fiegerlaw.com

{01674931.DOCX}

NOW COMES Plaintiff, LATOYA SINGLETON, as Personal Representative for the Estate of SHAMEELAH CHAMBERS, Deceased, by and through her attorneys, FIEGER, FIEGER, KENNEY & HARRINGTON, P.C., and for her Complaint against Defendants, states as follows:

## PRELIMINARY STATEMENT

1. ·This is a civil action for money damages brought under 42 U.S.C. § 1983 and § 1988, arising from violations of the Fourteenth Amendment to the United States Constitution, the Americans with Disabilities Act, and state laws, against the above-named Defendants.

2. On November 17 and 18, 2022, Plaintiff's Decedent, Shameelah Chambers ("Chambers" or "Plaintiff's decedent"), was denied medical care for her obvious and serious medical needs, as a pre-arraigned detainee in the Detroit Detention Center ("DDC").

3. Chambers, who was known to the DDC as an individual with a seizure disorder, heart disease, and drug addiction, was not properly searched and screened for her potentially life-threatening medical conditions during intake and booking, was denied life-saving substance abuse withdrawal and seizure medications and was not monitored according to DDC policy and procedure.

4. As a result of Defendants' failure to provide constitutionally mandated medical care, among other things, Chambers was found unresponsive in her cell

approximately 13 hours after she was booked into the DDC.

5.     Upon information and belief, Chambers' death was the result of a seizure due to drug intoxication, acute withdrawal, and/or her pre-exiting seizure disorder, all of which went unmonitored and untreated during her 13-hour detainment at the DDC, and despite her pleas for medication and to be taken to the hospital.

## JURISDISCTION AND VENUE

6.     Plaintiff, Latoya Singleton ("Plaintiff"), is the duly appointed Personal Representative for the Estate of Shameelah Chambers, Deceased, and at all times relevant to this action, is and was, a resident of the City of Detroit, County of Wayne, State of Michigan.

7.     Defendant, City of Detroit ("City"), is a Michigan municipal corporation responsible for the control and oversight of its departments, agencies, and facilities including the Detroit Police Department ("DPD"), and DDC.

8.     Defendant, Wellpath, LLC ("Wellpath"), is a foreign limited liability company, incorporated in Delaware, with its principal place of business located in Nashville, Tennessee, that routinely and systematically provides healthcare services to jails and prisons in Michigan, including the DDC, located in the City of Detroit, County of Wayne, State of Michigan.

9.      Defendant, Grand Prairie Healthcare Services, P.C. ("Grand Prairie"), is a foreign for-profit corporation, incorporated in Delaware, with its principal place of business located in Tennessee, that upon information and belief, is owned by, or is a subsidiary of Wellpath, and routinely and systematically provides healthcare services to jails and prisons in Michigan, including the DDC.

10.     Defendant, Officer Rafael Pierce ("Officer Pierce"), at all times relevant, is and was, a sworn police officer, employed by Defendant City, acting in the scope of his employment, in his capacity as a DPD Officer, and acting under the color of state law.

11.     Defendant, Officer James Corsi ("Officer Corsi"), at all times relevant, is and was, a sworn police officer, employed by Defendant City, acting in the scope of his employment, in his capacity as a DPD Officer, and acting under the color of state law.

12.     Defendant, Detention Facility Officer Thomas ("DFO Thomas"), at all times relevant, is and was, a corrections officer, employed by either Defendant City, or the Michigan Department of Corrections ("MDOC"), acting in the scope of his/her employment, in his/her capacity as a corrections officer at the DDC, and acting under the color of state law.

13.     Defendant, DFO Latanya Washington ("DFO Washington"), at all times relevant, is and was, a corrections officer, employed by either Defendant City,

or the MDOC, acting in the scope of her employment, in her capacity as a corrections officer at the DDC, and acting under the color of state law.

14. Defendant, DFO Ameeka Frazier ("DFO Frazier"), at all times relevant, is and was, a corrections officer, employed by either Defendant City, or the MDOC, acting in the scope of her employment, in her capacity as a corrections officer at the DDC, and acting under the color of state law.

15. Defendant, DFO K. Rudolph ("DFO Rudolph"), at all times relevant, is and was, a corrections officer, employed by either Defendant City, or the MDOC, acting in the scope of his/her employment, in his/her capacity as a corrections officer at the DDC, and acting under the color of state law.

16. Defendant, Lt. F. Bowens ("Lt. Bowens"), at all times relevant, is and was, a corrections officer, with the rank of lieutenant, employed by either Defendant City, or the MDOC, acting in the scope of his/her employment, in his/her capacity as a corrections officer at the DDC, and acting under the color of state law.

17. Defendant, Lt. R. Gilmore ("Lt. Gilmore"), at all times relevant, is and was, a corrections officer, with the rank of lieutenant, employed by either Defendant City, or the MDOC, acting in the scope of his/her employment, in his/her capacity as a corrections officer at the DDC, and acting under the color of state law.

18. Defendant, Lt. King, at all times relevant, is and was, a corrections officer, with the rank of lieutenant, employed by either Defendant City, or the

MDOC, acting in the scope of his/her employment, in his/her capacity as a corrections officer at the DDC, and acting under the color of state law.

19. Defendant, Lt. V. Hayes, at all times relevant, is and was, a corrections officer, with the rank of lieutenant, employed by either Defendant City, or the MDOC, acting in the scope of his/her employment, in his/her capacity as a corrections officer at the DDC, and acting under the color of state law.

20. Defendant, Lt. K. Walton ("Lt. Walton"), at all times relevant, is and was, a corrections officer, with the rank of lieutenant, employed by either Defendant City, or the MDOC, acting in the scope of his/her employment, in his/her capacity as a corrections officer at the DDC, and acting under the color of state law.

21. Defendant, Lt. M. Fenn ("Lt. Fenn"), at all times relevant, is and was, a corrections officer, with the rank of lieutenant, employed by either Defendant City, or the MDOC, acting in the scope of his/her employment, in his/her capacity as a corrections officer at the DDC, and acting under the color of state law.

22. Defendant, Sgt. R. Phillips ("Sgt. Phillips"), at all times relevant, is and was, a corrections officer, with the rank of sergeant, employed by either Defendant City, or the MDOC, acting in the scope of his/her employment, in his/her capacity as a corrections officer at the DDC, and acting under the color of state law.

23. Defendant, Capt. Blockett ("Capt. Blockett"), at all times relevant, is and was, a corrections officer, with the rank of captain, employed by either

Defendant City, or the MDOC, acting in the scope of his/her employment, in his/her

capacity as a corrections officer at the DDC, and acting under the color of state law.

24.     Defendant, Booking Officer J. Doe, at all times relevant, is and was, a

corrections officer, employed by either Defendant City, or the MDOC, acting in the

scope of his/her employment, in his/her capacity as a corrections officer at the DDC,

and acting under the color of state law.

25.     Defendants, DFO J. Does 1 – 5 ("DFO Does"), at all times relevant, are

and were, corrections officers, employed by either Defendant City, or the MDOC,

acting in the scope of their employment, in their capacity as corrections officers at

the DDC, and acting under the color of state law.

26.     Defendant, Intake Nurse Jane/John Doe, at all times relevant, is and

was, a licensed registered nurse, and or licensed practical nurse, employed by

Defendant, Wellpath and/or Grand Prairie, and contractually obligated to provided

healthcare services to pre-arraigned detainees at the DDC, including Plaintiff's

decedent.

27.     This Court has jurisdiction over Plaintiff's 42 U.S.C. § 1983, § 1988,

and 42 U.S.C. § 12101, *et. seq.* claims based upon the laws of the United States under

28 U.S.C. § 1331 and § 1343.

28.     Jurisdiction over Plaintiff's state law claims is conferred by Federal Rule

of Civil Procedure 18 and 28 U.S.C. § 1367.

29.     Venue lies in the Eastern District of Michigan pursuant to 28 U.S.C. §
1391(b) because the unlawful actions alleged in this Complaint occurred in the City
of Detroit, County of Wayne, located in the Southern Division of Eastern District of
Michigan.

**GENERAL ALLEGATIONS**

30.     In December of 2000, the United States Department of Justice ("DOJ")
initiated an investigation into the excessive use of force by the DPD.

31.     On March 6, 2002, the DOJ issued its "Detroit Police Dept. Use of
Force Findings Letter," finding blatant deficiencies in the DPD's use of force, use
of force reporting, external complaints, internal investigations, supervisory
oversight, discipline, and training policies and procedures.[1]

32.     As a result of its investigation, the United States of America filed a
complaint against the City and the DPD seeking "declaratory and equitable relief to
remedy a pattern or practice of conduct by law enforcement officers that deprives
individuals of rights, privileges, or immunities secured by the Constitution or federal
law."[2]

33.     In June 2003, the City entered into a Consent Judgment with the DOJ

---

[1] Letter from Steven H. Rosenbaum, Chief Special Litigation Section and Jeffrey G. Collins, United States Attorney, Eastern District of Michigan, to Ruth Carter, Corporation Counsel, City of Detroit (Mar. 6, 2002) (Exhibit 1).
[2] *United States of America v. City of Detroit, et. al.,* 2:03-cv-72258, ECF No. 1, PageID.1 (E.D. Mich., June 12, 2003).

regarding conditions of confinement.[3]

34.     The Consent Judgment required the City and the DPD to make changes to the way arrestees were housed and treated while confined, and "a decision was made within DPD that it was within the City's best interest to remove itself from the business of housing arrestees."[4]

35.     ·Thus, in its effort to become a constitutional policing agency as it pertains to detention, the City agreed to no longer hold pre-arraigned detainees at its precincts.

36.     The DDC was opened in August of 2013, at a former correctional facility in Detroit,[5] pursuant to an Interagency Agreement ("Agreement") between the City, the DPD, and the MDOC, whereby the City contracted with the MDOC to provide custody and security services to the DPD for pre-arraigned arrestees.

37.     Per the Agreement  the DDC is authorized to hold up to 200 pre-arraigned arrestees, aged 17 or older, for up to 72 hours.[6]

38.     The Agreement, that upon information and belief, was in effect at all times relevant[7], states that the MDOC shall:

---

[3] 2:03-cv-72258, ECF No. 22, PageID.194.
[4] Legislative Policy Division Memorandum from David Whitaker, Director, to Detroit City Council (Feb. 14, 2014) (Exhibit 2).
[5] https://www.michigan.gov/corrections/prisons/detroit-detention-center.
[6] Interagency Agreement Between the City of Detroit/Detroit Police Department and the Michigan Department of Corrections for the City of Detroit Detention Center (Exhibit 3).
[7] The Agreement was extended through July 31, 2024.

a.  Provide complete control of the facility operations (security, control, housing, food, programs, services, physical plant) and maintenance of the leased premises.

\*   \*   \*   \*   \*

p.  Provide MDOC custody staff, including but not limited to corrections officers, housing officers, shift command positions, adequate for intake, custody, placement, secure housing and feeding of up to 200 arrestees (150 males and 50 females) age 17 or older, 24 hours/7 days/week, 365 a year on behalf of DPD. Female arrestees shall be housed separately.

\*   \*   \*   \*   \*

r.  Provide MDOC medical staff adequate to provide on-site minor medical treatment and medication to arrestees with minor injuries/ailments.

(Exhibit 3, MDOC Obligations, ¶ 9, a., p., and r.).

39.  In addition to paying the MDOC for the leased space and services, under the Agreement, the DPD:

16.  Must provide two (2) onsite supervisors as assigned to ensure that probable cause hearings are conducted . . .

\*   \*   \*   \*   \*

19.  Must properly search all arrestees before entrance into the leased premises and ensure arrestees are properly restrained.

20.  Must document all searches of persons in an auditable manner and retain search records.

21. Must fill out the "MDOC/DPD Central Intake Admission Form" for each arrestee.

*   *   *   *   *

24. Must provide major medical treatment for any arrestee requiring, but not limited to hospitalization, ER treatment by ambulance, EMT assistance, surgery, cancer treatment, etc., whose cost will not be the responsibility of the MDOC. Prior to bringing the arrestee(s) to the DDC, if the arrestee has any injuries, DPD staff must transport of [sic] the arrestee(s) to any hospital or make arrangements for transport to a hospital, MDOC staff will accompany the arrestee to the hospital at which time custody of the arrestee will be transferred to DPD staff assigned to the hospital.

25. Shall be made aware of and not contravene MDOC policy and procedure to ensure a good and efficient working relationship between the parties. The MDOC will furnish its policies and procedures to DPD and DPD is responsible to ensure that its staff has been made aware of MDOC policies and procedures.

*Id.* at ¶ 16; 19-21; 24, 25.

40. The Agreement further requires that following an arrest, the DPD officer must present the arrestee to the MDOC personnel for the booking process. The arresting officer shall complete the "MDOC/DPD Central Intake Admission Form" and inform the MDOC supervisor of any unusual circumstances of the arrest and/or any known risks/threats involving the arrestee. *Id.* at Revised Exhibit 2 to Agreement, ¶ 5.

41.     The Agreement further requires that if a Breathalyzer test is given to the arrestee due to the nature of the arrest, DPD staff will conduct the test in the intake/processing area. *Id.* at Exhibit 2 to Agreement, ¶ 8.

42.     Prior to November 17, 2022, the MDOC contracted with Grand Prairie to provide healthcare services at the DDC.

43.     According to Contract No. 210000000685 between the State of Michigan and Grand Prairie, Defendant, Grand Prairie, was to provide prisoner healthcare and pharmacy services for all MDOC operated facilities, including the DDC, from April 21, 2021, through September 30, 2026.

44.     Schedule A, Statement of Work, Contract Activities, with respect to the DDC, the Contract states that:

> 1)    The Contractor (Grand Prairie) will be responsible for providing medical provider to provide on-site minor medical treatment and medication to arrestees with minor injuries/ailments.
>
> 2)    The Contractor will <u>not</u> be responsible for major medical treatment for any arrestee, requiring, but limited to hospitalization, ER treatment, transportation by ambulance, Emergency Medical Technician (EMT) assistance, surgery, cancer treatment, etc. . . .

(Exhibit 4 – Schedule A to Contract, p. 28).

## **SPECIFIC ALLEGATIONS**

45.     Plaintiff incorporates by reference each of the allegations contained in

the previous paragraphs as though fully set forth herein.

46.    ·On November 17, 2022, at approximately 7:01 p.m. (19:01 – military time used hereinafter), Plaintiff's decedent was stopped and questioned by Defendants, Officers Pierce and Corsi, for a suspected breaking and entering.

47.    Less than one month prior, Chambers was hospitalized due to a polysubstance overdose and entered a drug and alcohol rehabilitation program.

48.    Defendants, Officers Pierce and Corsi, told Chambers they were going to search the vehicle.

49.    According to the records, Chambers, admitted to hiding a crack stem pipe in the back seat.

50.    Defendants, Officer Pierce and Corsi's search of the vehicle revealed the crack pipe, an open alcohol container, and a firearm.

51.    Chambers was arrested and charged with "Weapons Offense-Concealed."

52.    While transporting her to the DDC, upon information and belief, Chambers told Defendants, Officers Pierce and Corsi, that she suffered from seizures as a daily drug user, due to acute withdrawal from drugs and alcohol, that she had heart disease, and required hospital care and/or her medication.

53.    Upon information and belief, Chambers was exhibiting signs of intoxication and/or drug and alcohol withdrawal at the time of her arrest and during

her transport to the DDC.

54.     Defendants, Officers Pierce and Corsi, upon information and belief, ignored Chambers' critical health information and her requests for medical attention.

55.      Instead, they transported her to the DDC, where she was booked in at 19:57.

56.     Upon information and belief, neither Defendants, Officer Pierce nor Corsi, completed the mandatory MDOC/DPD Central Intake Admission Form.

57.     Upon information and belief, neither Defendants, Officer Pierce nor Corsi, informed Defendants, Booking Officer J. Doe, and/or the MDOC or DPD supervisor, that Chambers suffered from seizures as a daily drug user, due to acute withdrawal from drugs and alcohol, that she had heart disease, and required hospital care and/or her medication.

58.     According to DDC policy, the arresting officer is required to perform a breathalyzer if he/she suspects the detainee is intoxicated.

59.     That neither Defendants, Officer Pierce nor Corsi, performed a breathalyzer test on Chambers.

60.     As part of the intake and booking process, Defendant, DFO Kelly, conducted a search of Chambers.

61.     According to Defendant, Officer Pierce's report, during the intake search,  DFO Kelly found suspected heroin in a folded piece of paper inside of

Chambers' pants.

62.    Defendant, DFO Kelly, did not document the suspected heroin, on the DDC Inmate Search Form contained in Chambers' jail records.

63.    Upon information and belief, during the booking and intake process, Chambers told the Defendants, DFO Kelly, and Booking Officer J. Doe, that she needed her seizure and/or drug withdrawal and heart medications, and that she required treatment at a hospital for acute substance abuse withdrawal.

64.    Again, upon information and belief, during the intake and booking process, Chambers was exhibiting obvious signs of acute drug and alcohol withdrawal and/or intoxication.

65.    Despite Chambers admissions above, and the prior searches revealing a crack pipe in her car, heroin on her person, and an open container of alcohol in her vehicle, Defendants, DFO Kelly, and/or Booking Officer J. Doe, did not conduct a secondary search of Chambers before admitting her into the jail, including a strip search, which may have revealed additional drugs.

66.    That upon information and belief, according to MDOC and/or DDC policy, a finding of illegal substances on an arrestee requires an officer in charge or supervisor in Building 100 to request a more thorough search, up to and including a "strip search" in Building 500.

67.    After the cursory search was completed by Defendant, DFO Kelly,

upon information and belief, and according to MDOC/DDC policy, Chambers should have been evaluated by Defendant, Intake Nurse Jane/John Doe, for a medical and mental health screening.

68.     That Defendant, DFO Kelly's supervisor, upon information and belief, either Defendants, Lt. Fenn, Lt. Bowens, Lt. King, Lt. Hayes, Lt. Gilmore, Lt. Hayes, Capt. Blockett, St. Phillips, or Lt. Walton, approved DFO's Kelly's cursory search.[8]

69.     That upon information and belief, and according to the records, Defendant, Intake Nurse Jane/John Doe, did not adequately screen Chambers for acute substance abuse withdrawal, seizure disorder, or her heart condition.

70.     That upon information and belief, Chambers told Defendant, Intake Nurse Jane/John Doe, she suffered from seizures, heart disease, and drug addiction, was a daily drug and alcohol user, was withdrawing from drugs and alcohol, and would require hospital care and medication during her detainment.

71.     That according to the DDC's "Admission Standing Orders" ("Admission Orders"), if a detainee complains of or has a history of cardiac issues, the detainee's medications must be verified, and the medical provider must monitor the detainee's symptoms.

---

[8] Plaintiff sued the City of Detroit in Wayne County Circuit Court based upon a failure to produce public records and documents under the Freedom of Information Act. Defendant, City, responded with its purported investigative file, but the names of the corrections officers and their supervisors are redacted. Plaintiff will likely amend her complaint once the unredacted records are produced by the City.

72.     Further, if a detainee complains of, notifies staff, or has a history of, seizure disorder due to substance withdrawal, or otherwise, the Admission Orders require that the inmate's medications must be verified, and the medical provider must monitor the symptoms.

73.     With respect to alcohol or drug withdrawal, the Admission Order requires a CIWA or COWS assessment if: a) the detainee arrives intoxicated, b) there is a report of intoxication, pre-booking, or (c) the detainee reports a history of drugs or alcohol withdrawal or detoxification.[9]

74.     If a detainee has a blood alcohol concentration of 0.25 or above, the Admission Order requires that the detainee be transferred to Detroit Receiving Hospital.

75.     Upon information and belief, Chambers' prior DDC jail and Patient Health Records ("PHR"), were available to Defendants, including Defendant, Intake Nurse Jane/John Doe.

76.     ·A cursory review of Chambers' PHR by Defendant, Intake Nurse Jane/John Doe, would have revealed from her prior incarcerations at the DDC, that she had medical alerts for drug and alcohol withdrawal, and her medical conditions of heart disease and seizure disorder, due to withdrawal or otherwise, were noted.

---

[9] Both the CIWA-ar (Clinical Institute Withdrawal Assessment of Alcohol Revised) and COWS (Clinical Opiate Withdrawal Scale) are tools used by clinicians to determine the stage or severity of alcohol and opiate withdrawal.

77.     Upon information and belief, and according to the records, Defendant, Intake Nurse Jane/John Doe, did not review Chambers' PHR or her prior jail records to review her alerts, medical conditions, and/or medications.

78.     Alternately, upon information and belief, Defendant, Intake Nurse Jane/John Doe, ignored the medical alerts and medical conditions noted in Chambers' PHR.

79.     Upon information and belief, Defendant, Intake Nurse Jane/John Doe, did not perform a CIWA or COWS assessment on Chambers to determine if she was experiencing alcohol or drug withdrawal, and the severity of the withdrawal.

80.     Upon further information and belief, Defendant, Intake Nurse Jane/John Doe, did not confirm Chambers' medications or take any action to ensure that she receive her prescribed medications during her incarceration.

81.     The only record documenting any medical or mental health condition of Chambers is an incomplete "Detainee Input Sheet," that upon information and belief, was completed by a supervisor, either Defendant, Lt. Fenn, Lt. Bowens, Lt. King, Lt. Hayes, Lt. Gilmore, Capt. Blockett, Sgt. Phillips, or Lt. Walton, where "Heart Issue" and "Seizures" are identified.

82.     Despite Chambers' repeated pleas that she needed medications for seizures and acute substance withdrawal, she was not assessed for acute substance abuse withdrawal, was not given any medications for her seizure disorder, heart

conditions or acute withdrawal, and was not placed on a withdrawal protocol which includes vital sign and physical monitoring.

83.     Upon information and belief, Chambers called her mother, the Plaintiff, and told her that she was withdrawing, needed her medications, and that she was being denied medical treatment.

84.     Upon information and belief, Plaintiff, then made several calls to the DDC and advised that her daughter, Chambers, needed her medications and was withdrawing from alcohol and heroin.

85.     Upon information and belief, Defendant, Booking Officer J. Doe, was responsible for classifying Chambers and assigning her to a "regular" cell or an "observation" cell, where her medical conditions could be more closely monitored.

86.     Upon information and belief, Defendant, Booking Officer J. Doe, assigned Chambers to a single person cell, Cell 43, which was not an observation cell.

87.     According to DDC Operating Procedure No. 05.01.144I, SECURITY INSPECTIONS/HEAD COUNTS, DFO's are required to conduct mandatory rounds and head counts of their floor, to ascertain that each detainee is "living and breathing":

> 3.   Conducts rounds no less than every 30 minutes, logs in appropriate logbook and conducts hourly informal head count of all offenders, and logs in appropriate book.

4.    ***Ensures to communicate verbally with those offenders who appear to be sleeping***.

(MDOC/DDC Operating Procedure No. 05.04.144I)(emphasis added).

88.    Upon information and belief, at all times relevant, the DDC utilized the "Guard I Rounding System" where during a cell check, the DFO's "pass" a wand over an electronic sensor outside of each cell. The sensor then records the date and time of the cell check for each detainee, and the DFO conducting it.

89.    According to the records, from the time that Chambers was placed in Cell 43, at around 20:30, until she was found unresponsive at approximately 9:18 on November 18, 2022, approximately 12 ½ hours elapsed.

90.    According to policy, the Defendant DFO's should have performed 24 or 25 cell checks during this time to ensure that Chambers was "alive and breathing" and did not require emergent medical care and treatment.

91.    Upon information and belief, during this 12 ½ hour period, Defendants, DFO Thomas, DFO Latanya Washington, DFO Ameeka Frazier, and DFO K. Rudolph, were the known officers assigned to the Women's Unit in Building 500.

92.    Upon further information and belief, Defendants, DFO Thomas, DFO Latanya Washington, DFO Ameeka Frazier, and DFO K. Rudolph, and DFO J. Does 1-5, were required to make rounds and conduct cell checks, during this 12 ½ hour period.

93.     Upon information and belief, the cell checks of Chambers did not occur as required, as cell check "logs" from the Guard I Rounding System, and security video footage of the cell block, were not produced by Defendant, Capt. Blockett, to the investigating law enforcement officers or Plaintiff.

94.     According to the Michigan Department of State Police Supplemental Incident Report ("MSP Report"), a verbal timeline of events was provided to the investigating officer, and while supporting documents were requested, they were never produced by Defendant, Capt. Blockett.

95.     The first event in the verbal timeline states that on November 18, 2023, Defendant, DFO Thomas, conducted a cell check at approximately 9:00 a.m.

96.     Defendant, DFO Thomas, told investigators that Chambers was lying on the mattress inside cell 43 and "*appeared to be sleeping.*"

97.     Upon information and belief, no written, electronic, or video recording of this cell check exists.

98.     Defendant, DFO Thomas, did not open the door, did not verbally communicate with Chambers, and did not ensure that she was alive and breathing at the 9:00 a.m. cell check in violation of DDC policy and Chambers' civil rights as more fully alleged herein.

99. According to the MSP Report, on November 18, 2022, at approximately 9:18 a.m., Defendant, DFO Thomas, made another round past Chambers' cell.

100. At that time, Defendant, DFO Thomas, told investigators Chambers was unresponsive.

101. According to the MSP Report, first responders arrived at Chambers' cell at 9:28.

102. Despite CPR and other lifesaving efforts, Shameelah Chambers, age 31, was pronounced dead at 10:05 a.m.

103. According to the Wayne County Medical Examiner's Office, Chambers died of a fentanyl overdose.

104. Upon information and belief, Chambers was either severely withdrawing and/or overdosing at the time of her admission into the jail, and the Defendants ignored her pleas for medical attention.

105. Further, Defendants failed to perform a proper search of Chambers, including a secondary search (strip or body cavity), where they knew that she suffered from drug addiction, was a daily drug user, *had drugs on her person when she was booked into the jail*, and was experiencing medical issues at the time of her booking related to her substance abuse, seizure disorder and heart condition.

106. As such, Chambers may have smuggled drugs into the DDC, which she later used to alleviate her painful and unrelenting withdrawal symptoms.

107. Due to the unlawful and unconstitutional conduct of the Defendants, Chambers, and Plaintiff, Latoya Singleton, as the Personal Representative of the Estate of Shameelah Chambers, suffered, and will continue to suffer damages into the future, including:

    a.    Wrongful death;

    b.    Severe and permanent hypoxic-ischemic brain injury causing death;

    c.    Severe pulmonary edema;

    d.    Cardiac arrest;

    e.    Conscious pain and suffering; physical and emotional;

    f.    Reasonable medical, hospital, funeral, and burial expenses;

    g.    Mental anguish;

    h.    Loss of love, society, and companionship;

    i.    Loss of wages and loss of earning capacity;

    j.    Loss of gifts, gratuities, and other items of economic value;

    k.    Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

l.   Attorney's fees, interest, and costs pursuant to 42 U.S.C.§1988, and

m.   All other damages otherwise recoverable under federal law and the Michigan Wrongful Death and Survival Act, M.C.L. §600.2922, *et. seq.*

## COUNT I
## 42 U.S.C §1983 – VIOLATION OF THE FOURTEENTH AMENDMENT – DENIAL OF MEDICAL CARE/DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS

**(AGAINST DEFENDANTS, OFFICER RAFAEL PIERCE, OFFICER JAMES CORSI, DFO THOMAS, DFO LATANYA WASHINGTON, DFO AMEEKA FRAZIER, DFO K. RUDOLPH, LT. F. BOWENS, LT. R. GILMORE, LT. KING, LT. V. HAYES, LT. K. WALTON, LT. M. FENN, SGT. R PHILLIPS, CAPT. BLOCKETT, BOOKING OFFICER J. DOE, DFO J. DOES 1 – 5)**

**("CORRECTIONS DEFENDANTS")**

108.  Plaintiff incorporates by reference each allegation contained in the previous paragraphs as though fully stated herein.

109.  42 U.S.C. §1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state of territory of the District of Colombia subjects or caused to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secure by the constitution and shall be liable to the party injured in an action at law, suit or in equity, or other appropriate proceedings for redress.

110.  At all times relevant, the Corrections Defendants were acting under the color of state law employed by Defendant, City and/or MDOC, acting in the scope

of their employment, and in their capacity as DFO officers and supervisors.

111.   At all times relevant, as a pre-arraigned detainee, Chambers had a clearly established right to medical care for serious medical needs under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

112.   Chambers' medical needs for acute substance abuse withdrawal with seizure disorder, a heart condition for which she was prescribed medications, and a possible overdose, were objectively serious medical needs.

113.   In November of 2022, the law was clearly established in this Circuit that acute substance withdrawal from drugs and alcohol can be fatal, and therefore, it is an objectively serious medical need.

114.   The law was also further clearly established that a medical condition that has been diagnosed by a physician, namely seizure disorder and/or heart disease requiring medication, is an objectively serious medical need.

115.   Any objectively reasonable officer in this Circuit was on notice that Chambers' medical conditions were serious.

116.   Further, any objectively reasonable officer in this Circuit was on notice that it is unlawful and unconstitutional to deny medical care to Chambers' serious medical needs, as she then and there presented at the DDC on November 17th and 18th of 2022. *Estate of Owensby*, 414 F.3d 596,604 (6th Cir. 2005).

117.   Based upon the allegations contained in the foregoing paragraphs, each

and every Corrections Defendant had subjective knowledge of Chambers' serious medical condition, and consciously disregarded her serious medical needs, to an excessive risk of Chambers' health and safety, by the following acts and/or omissions:

    a.    After her arrest, failing to take Chambers directly to the hospital where it was obvious she needed immediate medical attention;

    b.    Failing to report the crack pipe and alcohol found in Chambers' vehicle to the Booking Officer, and otherwise report any pertinent information regarding her medical condition;

    c.    Failing to conduct a secondary search of Chambers' body after heroin was found during the first search;

    d.    Failing to document and report that heroin was found on Chambers during the first search;

    e.    Failing to conduct a breathalyzer test to determine if Chambers BAC was over 0.25, requiring transport to Detroit Receiving Hospital, where an open container of alcohol was found in her vehicle;

    f.    Failing to listen to Chambers' ongoing requests for medical attention and medication for her physician-diagnosed seizure disorder, substance abuse disorder and heart condition;

    g.    Ignoring the telephone calls from Plaintiff regarding Chambers' medical conditions and medications;

    h.    Failing to review Chambers prior jail and health records to determine if she had withdrawal issues during prior incarcerations and/or had been on a withdrawal protocol including the administration of

life-saving withdrawal medications;

i.     Failing to arrange for the timely evaluation and assessment by medical staff;

j.     Failing to confirm that Chambers was taking medications for recognized and physician diagnosed serious medical conditions;

k.     Failing to follow Admission Orders;

l.     Failing to follow DDC Pre-Booking, Booking and Intake policies and procedures;

m.     Failing to properly perform a CIWA and/or COWS assessment;

n.     Failing to properly monitor Chambers' vital signs;

o.     Ignoring information from family members who called the jail to inform Defendants that Chambers required medications for her serious medical conditions;

p.     Failing to place Chambers in a medical observation cell;

q.     Failing to conduct cell checks as required;

r.     Failing to properly conduct cell checks to ensure that the inmate was alive and breathing;

s.     Failing to document that the cell checks occurred, and that Chambers was alive and breathing;

t.     Failing to transport Chambers to a higher level of care, including an Acute Care Unit and/or Hospital, when her medical condition worsened;

u.     Failing to monitor Chambers when she was known

to be ill;

v. Failing to request medical help, including emergency medical attention, before 9:18 a.m. on November 18, 2022; and

w. Any other acts or omissions that become known.

118. The Corrections Defendants are not entitled to qualified immunity.

119. The conduct of Corrections Defendants, was and remains shocking, extreme, intentional, malicious, oppressive, willful, and outrageous, subjecting the Corrections Defendants to punitive damages.

120. Due to the unlawful and unconstitutional conduct of the Corrections Defendants, Chambers, and Plaintiff, Latoya Singleton, as the Personal Representative of the Estate of Shameelah Chambers, suffered, and will continue to suffer damages into the future, including:

a. Wrongful death;

b. Severe and permanent hypoxic-ischemic brain injury causing death;

c. Severe pulmonary edema;

d. Cardiac arrest;

e. Conscious pain and suffering; physical and emotional;

f. Reasonable medical, hospital, funeral, and burial expenses;

g. Mental anguish;

    h.     Loss of love, society, and companionship;

    i.     Loss of wages and loss of earning capacity;

    j.     Loss of gifts, gratuities, and other items of economic value;

    k.     Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

    l.     Attorney's fees, interest, and costs pursuant to 42 U.S.C.§1988, and

    m.     All other damages otherwise recoverable under federal law and the Michigan Wrongful Death and Survival Act, M.C.L. §600.2922, *et. seq.*

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter a judgment against the Corrections Defendants, Jointly and Severally, in the amount of $10,000,000.00 exclusive of costs, interest, and actual attorney fees.

## COUNT II

## 42 U.S.C §1983 – VIOLATION OF THE FOURTEENTH AMENDMENT – DENIAL OF MEDICAL CARE/DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS

### (AGAINST DEFENDANT, INTAKE NURSE JANE/JOHN DOE)

121. Plaintiff incorporates by reference each allegation contained in the previous paragraphs as though fully stated herein.

122. Defendant, Intake Nurse Jane/John Doe, was employed by Defendants, Grand Prairie and/or Wellpath, as a licensed health care professional, pursuant to a

contract between the MDOC and Defendants, Grand Prairie and/or Wellpath.[10]

123. It is well-established in this Circuit that a private medical provider who contracts with the state for healthcare services to prisoners is acting under the "color of state law" and is not protected by the doctrine of qualified immunity. *Bartell v. Lohiser*, 215 F.3d 550, 556 (6th Cir. 2000); *Duncan v. Peck*, 844 F.2d 1261, 1264 (6th Cir. 2000); *Harrison v. Ash*, 539 F.3d 510, 518-519 (6th Cir. 2008).

124. Prior to November 17, 2022, the MDOC contracted with Grand Prairie and/or Wellpath to provide healthcare services at the DDC.

125. According to Contract No. 210000000685 between the State of Michigan and Grand Prairie, Defendants, Grand Prairie and/or Wellpath, were to provide prisoner healthcare and pharmacy services for all MDOC operated facilities, including the DDC, from April 21, 2021, through September 30, 2026.

126. Schedule A, Statement of Work, Contract Activities, with respect to the DDC, the Contract states that:

> 3) The Contractor (Grand Prairie) will be responsible for providing medical provider to provide on-site minor medical treatment and medication to arrestees with minor injuries/ailments.

> 4) The Contractor will not be responsible for major medical treatment for any arrestee, requiring, but limited to hospitalization, ER treatment, transportation by ambulance, Emergency Medical

---

[10] Defendant Grand Prairie, upon information and belief, is owned or a subsidiary of Wellpath. The company's names are interchanged throughout the contract and other documents.

> Technician (EMT) assistance, surgery, cancer
> treatment, etc . . .

(Exhibit 4, Schedule A, ¶ j.)

127.   Upon information and belief, Defendant, Intake Nurse Jane/John Doe, had actual knowledge of Chambers' objectively serious medical needs, seizure disorder, substance abuse disorder, acute substance abuse withdrawal, daily drug use, and a heart condition.

128.   Upon information and belief, despite Defendant, Intake Nurse Jane/John Doe's subjective knowledge of Chambers' serious medical conditions, Defendant, Intake Nurse Jane/John Doe, consciously disregarded Chambers' serious medical needs to an excessive risk to Chambers' health and safety, by the following acts and/or omissions:

a.   Failing to listen to Chambers' ongoing requests for medical attention and medication for her physician-diagnosed seizure disorder, substance abuse disorder and heart condition;

b.   Failing to review Chambers' prior jail and health records to determine if she had withdrawal issues during prior incarcerations and/or had been on a withdrawal protocol including the administration of life-saving withdrawal medications;

c.   Failing review Chambers' prior jail and health records to determine if she had any medical alerts from prior incarcerations;

d.   Alternatively, ignoring pertinent health information in Chambers' PHR and jail records;

e.    Failing to confirm Chambers' medications, including the doses and treatment plan, for recognized and physician diagnosed serious medical conditions;

f.    Failing to follow a doctor's treatment plan for Chambers' serious medical conditions, including her medication schedule;

g.    Failing to provide Chambers with her medications as ordered by her physician;

h.    Ignoring information from family members who called the jail to inform Defendant that Chambers required medications for her serious medical conditions;

i.    Failing to place Chambers in medical observation;

j.    Failing to conduct a proper intake health screening of Chambers;

k.    Failing to perform a CIWA-ar and/or COWS assessment of Chambers;

l.    Failing to contact a medical provider for Substance Abuse Withdrawal Orders, including vital signs monitoring, placement in an observation cell, and medication to manage seizures and other symptoms of acute withdrawals;

m.    Failing to transfer Chambers to a higher level of care including an Acute Care Facility and/or emergency department when her condition worsened;

n.    Failing to conduct any face-to-face assessments of Chambers after the initial intake health screening despite her pleas for medication and medical

attention;

o.   Failing to monitor Chambers when she was known to be ill;

p.   Failing to take Chambers' vital signs as required;

q.   Failing to request medical help, including emergency medical attention, before 9:18 a.m. on November 18, 2022; and

r.   Any other acts or omissions that become known.

129.   The conduct of Defendant, Intake Nurse Jane/John Doe, was and remains shocking, extreme, intentional, malicious, oppressive, willful, and outrageous, subjecting the Defendant, Intake Nurse Jane/John Doe, to punitive damages.

130.   Due to the unlawful and unconstitutional conduct of the Defendant, Intake Nurse Jane/John Doe, Chambers and Plaintiff, Latoya Singleton, as the Personal Representative of the Estate of Shameelah Chambers, suffered, and will continue to suffer damages into the future, including, but not limited to:

a.   Wrongful death;

b.   Severe and permanent hypoxic-ischemic brain injury causing death;

c.   Severe pulmonary edema;

d.   Cardiac arrest;

e.   Conscious pain and suffering; physical and emotional;

f.  Reasonable medical, hospital, funeral, and burial expenses;

g.  Mental anguish;

h.  Loss of love, society, and companionship;

i.  Loss of wages and loss of earning capacity;

j.  Loss of gifts, gratuities, and other items of economic value;

k.  Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

l.  Attorney's fees, interest, and costs pursuant to 42 U.S.C.§1988, and

m.  All other damages otherwise recoverable under federal law and the Michigan Wrongful Death and Survival Act, M.C.L. §600.2922, *et. seq.*

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter a judgment against Defendant, Intake Nurse Jane/John Doe, in the amount of $10,000,000.00 exclusive of costs, interest, and actual attorney fees.

## COUNT III

### 42 U.S.C. § 1983 – CUSTOM, POLICY OR PRACTICE OF INADEQUATE TRAINING AND SUPERVISION, AND TOLERANCE OR ACQUIESENCE OF FEDERAL RIGHTS VIOLATIONS

### (AGAINST DEFENDANT, CITY OF DETROIT)

131.  Plaintiff incorporates by reference each allegation contained in the previous paragraphs as though fully stated herein.

132.    The Agreement between the MDOC and the City and the DPD created a joint venture or partnership between the DPD and the MDOC for the administration and operation of the DDC.

133.    All actions taken or performed by employees and/or agents of either party to such joint venture were taken in furtherance of the intent and purpose of the joint venture and were performed under authority of the partnership or joint venture and were performed under the color of law.

134.    Each joint venturer or partner of such joint venture/partnership is liable for the acts of the other.

135.    The City's unconstitutional policies, practice, and customs, are demonstrated by the following conduct:

      a.    Failing to properly train its officers as to how to respond to a detainee's request for medical treatment;

      b.    Failing to properly supervise its officers as to how to respond to a detainee's request for medical treatment;

      c.    Failing to train its officers as to a proper search of arrestees;

      d.    Failing to train its officers to recognize the signs of substance abuse disorder, intoxication, and acute alcohol and drug withdrawal;

      e.    Failing to enforce policies and procedures regarding Admission, Intake and Booking at the DDC;

f.    Failing to train its officers regarding cell checks, including how and when to conduct them, and documenting same;

g.    Failing to ensure that detainees with substance abuse disorder, and acute alcohol and drug withdrawal are provided necessary medical care;

h.    Failing to train its contracted medical personnel on DDC policies and procedures regarding intake and booking;

i.    Failing to properly and adequately staff the DDC with qualified corrections and medical personnel including an onsite medical provider;

j.    Failing to supervise its officers and contracted medical personnel to ensure that detainees' serious medical needs are not being ignored; and

k.    Any other training failures or deficiencies that become known.

136.   That detainees suffering from substance abuse disorder and acute alcohol and drug withdrawal are common occurrences at the DDC, and the need for such training was obvious and foreseeable.

137.   That Defendant, City's failure to train and supervise its officers in the face of these recurring and ongoing situations with detainees demonstrates its deliberate indifference to detainees' serious medical needs in violation of the Fourteenth Amendment.

138.   The systematic failure to train and supervise officers in the manner set forth in the previous paragraphs demonstrates a policy or custom which was the moving force behind the constitutional violations as alleged herein.

139.   Defendant, City, is not entitled to qualified immunity as it was clearly established in this Circuit that seizures due to acute drug and alcohol withdrawal, and heart disease requiring medication, are serious medical needs.

140.   Defendant, COD, is not entitled to qualified immunity as it was clearly established in this Circuit that failure to train its officers on how to recognize and manage acute alcohol or drug withdrawal, is a common and foreseeable occurrence, is deliberate indifference of serious medical needs, and a violation of a detainee's constitutional rights.

141.   As a result of the Defendant, City's deliberate indifference to Plaintiff's decedent's civil rights and its policy and custom that led to the deprivation of those rights, Chambers and Plaintiff, Latoya Singleton, as the Personal Representative of the Estate of Shameelah Chambers, suffered, and will continue to suffer damages into the future, including, but not limited to:

   a.    Wrongful death;

   b.    Severe and permanent hypoxic-ischemic brain injury causing death;

   c.    Severe pulmonary edema;

   d.    Cardiac arrest;

e.    Conscious pain and suffering; physical and emotional;

f.    Reasonable medical, hospital, funeral, and burial expenses;

g.    Mental anguish;

h.    Loss of love, society, and companionship;

·i.    Loss of wages and loss of earning capacity;

j.    Loss of gifts, gratuities, and other items of economic value;

k.    Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

l.    Attorney's fees, interest, and costs pursuant to 42 U.S.C.§1988, and

m.    All other damages otherwise recoverable under federal law and the Michigan Wrongful Death and Survival Act, M.C.L. §600.2922, *et. seq.*

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter a judgment against Defendant, City of Detroit, in the amount of $10,000,000.00 exclusive of costs, interest, and actual attorney fees.

## COUNT IV

## 42 U.S.C. § 1983 – CUSTOM, POLICY OR PRACTICE OF INADEQUATE TRAINING AND SUPERVISION, AND TOLERANCE OR ACQUIESENCE OF FEDERAL RIGHTS VIOLATIONS

### (AGAINST DEFENDANTS, GRAND PRAIRIE HEALTHCARE SERVICES, P.C. AND WELLPATH, LLC)

### ("HEALTHCARE DEFENDANTS")

142. Plaintiff incorporates by reference each allegation contained in the previous paragraphs as though fully stated herein.

143. Defendants, Grand Prairie and/or Wellpath, contracted with the MDOC to provide medical treatment to detainees held at the DDC, which included Plaintiff's decedent.

144. The Healthcare Defendants failed in their duties to adequately train their medical staff at DDC, including, but not limited to: Defendant, Intake Nurse Jane/John Doe, and any other nurses, and medical providers.

145. The Healthcare Defendants adopted, ratified, and/or implemented the unconstitutional policies, practices, and procedures which denied Plaintiff's decedent reasonable medical treatment, by failing to properly train their medical staff, by the following acts and/or omissions:

    a.     Failing to properly train medical staff regarding how to respond to a detainee's request for medical treatment;

b.    Failing to properly supervise medical staff regarding how to respond to a detainee's request for medical treatment;

c.    Failing to train medical staff regarding DDC Admission, Pre-booking, Booking and Intake orders, policies, and procedures;

d.    Failing to train medical staff regarding how to recognize the signs of substance abuse disorder, intoxication, and acute alcohol and drug withdrawal;

e.    Failing to train medical staff and enforce policies and procedures regarding the performance of CIWA and/or COWS assessments;

f.    Failing to train medical staff and enforce policies and procedures regarding monitoring detainees who are intoxicated and/or are acutely withdrawing from drugs or alcohol;

g.    Failing to train medical staff and enforce policies and procedures regarding the verification of a detainee's medications;

h.    Failing to ensure that detainees with substance abuse disorder, and acute alcohol and drug withdrawal are provided reasonable and necessary medical care;

i.    Failing to train medical staff and enforce policies regarding sending an acutely ill detainee to the hospital or to a facility that can provide a higher level of care;

j.    Failing to properly and adequately staff the DDC with qualified medical personnel including an onsite medical provider;

k.  Failing to supervise medical personnel to ensure that detainees' serious medical needs are not being ignored;

l.  Failure to train and supervise medical staff regarding the rendering immediate medical attention to a detainee who was in severe and acute withdrawal from drugs or alcohol; and

m.  Any other training failures or deficiencies that become known.

146.  The acts and omissions of the Healthcare Defendants, taken pursuant to the de facto policies, practices, and procedures, adopted, ratified, and/or implemented by them, impermissibly condoned and allowed for the denial of proper medical care and treatment to pre-arraigned detainees at the DDC, including Plaintiff's decedent.

147.  The aforesaid acts and omissions of the Healthcare Defendants were committed under the color of state law.

148.  That the Healthcare Defendants are not entitled to qualified immunity.

149.  The acts and omissions of the Healthcare Defendants constituted deliberate indifference to the serious and apparent medical needs of Plaintiff's decedent, in violation of the Fourteenth Amendment to the Constitution of the United States and hence, are actionable under 42 U.S.C. § 1983.

150.  As a result of the Healthcare Defendants' deliberate indifference to

Plaintiff's decedent's civil rights and their policy and custom that led to the deprivation of those rights, Chambers and Plaintiff, Latoya Singleton, as the Personal Representative of the Estate of Shameelah Chambers, suffered, and will continue to suffer damages into the future, including, but not limited to:

a. Wrongful death;

b. Severe and permanent hypoxic-ischemic brain injury causing death;

c. Severe pulmonary edema;

d. Cardiac arrest;

e. Conscious pain and suffering; physical and emotional;

f. Reasonable medical, hospital, funeral, and burial expenses;

g. Mental anguish;

h. Loss of love, society, and companionship;

i. Loss of wages and loss of earning capacity;

j. Loss of gifts, gratuities, and other items of economic value;

k. Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

l. Attorney's fees, interest, and costs pursuant to 42 U.S.C.§1988, and

m.    All other damages otherwise recoverable under federal law and the Michigan Wrongful Death and Survival Act, M.C.L. §600.2922, *et. seq.*

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter a judgment against Defendants, Grand Prairie Healthcare Services, P.C., and Wellpath, LLC, in the amount of $10,000,000.00 exclusive of costs, interest, and actual attorney fees.

## COUNT V

## VIOLATION OF AMERICANS WITH DISABILITIES ACT (ADA) – DISCRIMINATION & FAILURE TO ACCOMMODATE

## (AGAINST ALL DEFENDANTS)

151.   Plaintiff incorporates by reference each allegation contained in the previous paragraphs as though fully stated herein.

152.   That at all times relevant, Plaintiff's decedent was an individual, and Defendants provided a public service, within the meaning of the Americans with Disabilities Act ("ADA"), being 42 USC 12131, *et seq.*

153.   That DDC/MDOC Policy Directive No. 03.03.130, effective April 1, 2022, addresses Humane Treatment and Living Conditions for Prisoners by the following:

All prisoners committed to the jurisdiction of the Department shall be treated humanely with dignity in ·matters of health care, personal safety, and general living conditions. They also should not be discriminated against

based on race, religion, ethnic background, sex, sexual orientation, gender identity, national origin, *or disability.*

154.   At all times relevant, Plaintiff's decedent was a person with a disability in accordance with the ADA, in that she had medical conditions including heart disease, seizure and substance abuse disorder, all of which substantially limited one or more of her major life activities.

155.   At all times relevant, Defendants had a duty to accommodate Plaintiff's decedent, unless the accommodation would impose an undue hardship.

156.   At all times relevant, Defendants could have accommodated Plaintiff's decedent's disability without suffering undue hardship.

157.   At all times relevant, Defendants were prohibited from discriminating against Plaintiff's decedent because of her disability.

158.   That the Defendants violated the ADA by failing to diagnose, treat, and monitor Chambers' known medical conditions, by failing to place her on a withdrawal protocol, which includes vital signs monitoring, observation, and administering withdrawal medications if necessary, by failing to recognize that she was acutely intoxicated with drugs or alcohol and required a higher level of care, not providing her with adequate supervision, not providing her with her prescription medications, and failing to provide her with medical care when it was known Plaintiff's decedent was withdrawing, overdosing, and/or suffering from seizures or a heart attack.

159. That the above-described conduct of Defendants, as specifically set forth in Counts I through IV, was a proximate cause of Plaintiff's and her decedent's damages, including, but not limited to:

a. Wrongful death;

b. Severe and permanent hypoxic-ischemic brain injury causing death;

c. Severe pulmonary edema;

d. Cardiac arrest;

e. Conscious pain and suffering; physical and emotional;

f. Reasonable medical, hospital, funeral, and burial expenses;

g. Mental anguish;

h. Loss of love, society, and companionship;

i. Loss of wages and loss of earning capacity;

j. Loss of gifts, gratuities, and other items of economic value;

k. Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

l. Attorney's fees, interest, and costs pursuant to 42 U.S.C.§1988, and

m. All other damages otherwise recoverable under federal law and the Michigan Wrongful Death and Survival Act, M.C.L. §600.2922, *et. seq.*

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter a judgment against all Defendants, jointly and severally, in the amount of $10,000,000.00 exclusive of costs, interest, and actual attorney fees.

## COUNT VI

### GROSS NEGLIGENCE

**(AGAINST DEFENDANTS, OFFICER RAFAEL PIERCE, OFFICER JAMES CORSI, DETENTION FACILITY OFFICER (DFO) THOMAS, DFO LATANYA WASHINGTON, DFO AMEEKA FRAZIER, DFO K. RUDOLPH, LT. F. BOWENS, LT. R. GILMORE, LT. KING, LT. V. HAYES, LT. K. WALTON, LT. M. FENN, SGT. R. PHILLIPS, CAPT. BLOCKETT, BOOKING OFFICER J. DOE, DFO J. DOES 1 – 5)**

### ("CORRECTIONS DEFENDANTS")

160.   Plaintiff incorporates by reference each allegation contained in the previous paragraphs as though fully stated herein.

161.   The Corrections Defendants owed Chambers a duty to use ordinary care to ensure her safety, and the right to adequate medical care while a pre-arraigned detainee, as described in Counts I and V above.

162.   The Corrections Defendants are not entitled to governmental immunity under Michigan law, MCL §691.1407, *et. seq.* as their conduct amounted to gross negligence, and/or willful and wanton misconduct.

163.   Further, the Corrections Defendants' conduct demonstrated a willful disregard for precautions to ensure Chambers' safety and created a substantial risk

of serious harm.

164.   As fully set forth in the Specific Allegations and Counts I and V, the Corrections Defendants breached their duty of care owed to Chambers and were grossly negligent in that the misconduct by the Corrections Defendants was committed with reckless disregard for Chambers' safety, health, and with a substantial lack of concern to whether an injury resulted.

165.   That as the proximate result of the unlawful conduct described herein, Chambers, and Plaintiff, Latoya Singleton, as the Personal Representative of the Estate of Shameelah Chambers, suffered, and continue to suffer damages, including:

a.   Wrongful death;

b.   Severe and permanent hypoxic-ischemic brain injury causing death;

c.   Severe pulmonary edema;

d.   Cardiac arrest;

e.   Conscious pain and suffering; physical and emotional;

f.   Reasonable medical, hospital, funeral, and burial expenses;

g.   Mental anguish;

h.   Loss of love, society, and companionship;

i.   Loss of wages and loss of earning capacity;

j.   Loss of gifts, gratuities, and other items of economic value;

k.   Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

l.   Attorney's fees, interest, and costs pursuant to 42 U.S.C.§1988, and

m.   All other damages otherwise recoverable under federal law and the Michigan Wrongful Death and Survival Act, M.C.L. §600.2922, *et. seq.*

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter a judgment against Defendants, Officer Rafael Pierce, Officer James Corsi, DFO Thomas, DFO Latanya Washington, DFO Ameeka Frazier, DFO K. Rudolph, LT. F. Bowens, LT. R. Gilmore, LT. King, LT. V. Hayes, LT. K. Walton, Lt. M. Fenn, Sgt. R. Phillips, Capt. Blockett, Booking Officer J. Doe, and DFO J. Does 1 – 5, jointly and severally, in the amount of $10,000,000.00 exclusive of costs, interest, and actual attorney fees.

## **PRAYER FOR RELIEF**

Plaintiff prays that this Court enter judgment in the amount of $10,000,000.00 for the Plaintiff and against Defendants, jointly and severally, and grant:

a.   Compensatory and consequential damages, allowable under the Michigan Wrongful Death Statute and Survival Statute;

b.   Economic losses on all claims allowed by law;

c.   Special damages in an amount to be determined at

trial;

d.  Punitive damages on all claims allowed by law against the Corrections and Healthcare Defendants, and in an amount to be determined at trial;

e.  Nominal damages on allowable claims;

f.  Attorneys' fees and the costs associated with this action under 42 U.S.C. §1988, including expert witness fees, on all claims allowed by law;

g.  Pre- and post-judgment interest at the lawful rate; and

h.  Any further relief that this Court deems just and proper, and any other appropriate relief at law and equity.

Respectfully submitted,

FIEGER, FIEGER, KENNEY & HARRINGTON, P.C.

BY: */S/ Jennifer G. Damico*
JENNIFER G. DAMICO (P51403)
Attorney for Plaintiffs
19390 W. Ten Mile Rd.
Southfield, MI 48075
(248) 355-5555/Fax (248) 233-3521
j.damico@fiegerlaw.com

Dated: September 10, 2024

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

LATOYA SINGLETON, as Personal
Representative of the Estate of
SHAMEELAH CHAMBERS, Deceased,

               Case No.

      Plaintiff,              Hon.

v.

CITY OF DETROIT, a Michigan
Municipal Corporation, WELLPATH,
LLC, a Foreign Limited Liability
Company, GRAND PRAIRIE
HEALTHCARE SERVICES, P.C.,
a Foreign For-Profit Corporation,
OFFICER RAFAEL PIERCE, OFFICER
JAMES CORSI, DETENTION FACILITY
OFFICER (DFO) THOMAS, DFO LATANYA
WASHINGTON, DFO AMEEKA FRAZIER,
DFO K. RUDOLPH, LT. F. BOWENS,
LT. R. GILMORE, LT. KING, LT. V. HAYES,
LT. K. WALTON, LT. M. FENN, SGT. R.
PHILLIPS, CAPT. BLOCKETT, BOOKING
OFFICER J. DOE, DFO J. DOES 1 – 5,
INTAKE NURSE JANE/JOHN DOE, in their
Individual Capacities, Jointly and Severally,

        Defendants.

_____

JAMES J. HARRINGTON (P65351)
JENNIFER G. DAMICO (P51403)
Fieger, Fieger, Kenney &
Harrington, P.C.
*Attorneys for Plaintiff*
19390 West Ten Mile Road
Southfield, MI 48075
(248) 355-5555/(248) 233-3521 Fax
j.damico@fiegerlaw.com

_____

{01677591.DOCX}

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, a trial by jury

is demanded on all the issues presented herein.

Respectfully submitted,

FIEGER, FIEGER, KENNEY & HARRINGTON

BY:   */S/ Jennifer G. Damico*
JAMES J. HARRINGTON, IV (P65351)
JENNIFER G. DAMICO (P51403)
Attorney for Plaintiffs
19390 W. Ten Mile Rd.
Southfield, MI 48075
(248) 355-5555/Fax (248) 355-5148
j.damico@fiegerlaw.com

Date: September 10, 2024

{01420207.DOCX}

# EXHIBIT 1

# DETROIT POLICE DEPT. USE OF FORCE FINDINGS LETTER

March 6, 2002

Ms. Ruth Carter
Corporation Counsel
City of Detroit
660 Woodward Avenue, Suite 1650
Detroit, MI 48226-3491

    Re: Investigation of the Detroit Police Department

Dear Ms. Carter:

    As you know, the Civil Rights Division and the United States Attorney's Office for the Eastern District of Michigan are jointly conducting an investigation of the Detroit Police Department (DPD), pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. 1½§ 14141. We greatly appreciate the cooperation of the City of Detroit and the DPD thus far in this investigation.

    At the beginning of our investigation, you requested that we inform you as soon as possible if we identified any problems during the course of the investigation. Since the investigation began, we and our consultants have reviewed hundreds of pages of documents, and interviewed over one hundred DPD officers, including command-level and line officers. Based on this preliminary review, we have identified several areas of concern, which we set forth below, along with our recommendations for addressing these problems.

    Important aspects of our fact-gathering process have yet to be completed, most notably reviewing DPD incident reports and investigations provided by the City. Therefore, this letter is not meant to be exhaustive, but rather focuses on significant concerns we have identified and recommendations we can provide based on our review of the DPD's policies and procedures.

    The issues identified below focus on the following areas: use of force and use of force reporting, external complaints, internal investigations, supervisory oversight, discipline, and training. Please note that we may identify additional issues as our investigation progresses, and that the concerns discussed below do not relate to the components of our investigation that are focused on holding cell conditions and arrest and witness detention policies and practices.

## I. Use of force and use of force reporting

### A. Use of force

    DPD policy does not define "use of force," nor adequately address when and in what manner the use of less-than-lethal force is permitted. In addition, DPD officers only have a limited array of force options available. The vast majority of DPD officers are permitted to use only two weapons: a firearm and chemical spray (officers on foot patrol and officers in the Tactical Services Section are permitted to carry a baton). This limited array of force options may lead to the use of excessive force in situations where chemical spray may be an inappropriate option, but the use of deadly force is not justified.

We recommend that DPD policy define "use of force," and ensure that the definition includes all physical (pain compliance, punches, kicks, leg sweeps, etc.) and instrumental (firearm, baton, chemical spray, flashlight, etc.) acts that impose any degree of force on a member of the public. DPD policy should adequately address when and in what manner the use of less-than-lethal force is permitted. The DPD should train officers in these policies.

We recommend that the DPD make at least one additional intermediate force option available to all officers, and train all officers in the use of this option. The additional intermediate force option should be one that can reasonably be carried by all officers at all times while on duty, be higher on the force continuum than chemical spray, and be lower on the force continuum than a firearm, e.g., a collapsible baton.

B. Use of force reporting

Pursuant to DPD policy, officers are not required to report uses of force other than uses of firearms and chemical spray, unless the use of force results in a visible injury or complaint of injury. Officers are required to report firearms and chemical spray discharges in a Preliminary Complaint Report (PCR). Some officers indicated that they would report a use of force pursuant to an arrest in the PCR in which they reported the arrest. For shots fired, chemical spray discharges, injuries to prisoners, police chases, and the destruction of animals, supervisors are required to complete a Police Action Incident Report (PAIR), on which they record information regarding the incident and their disciplinary or corrective action recommendation.

Both the PCR and the PAIR are apparently incident-based, so that one PCR and one PAIR are sometimes used to report multiple uses of force if they occurred in the same incident. This may result in supervisors failing to evaluate the appropriateness of each individual use of force. Additionally, one PAIR is used to record all officers involved in an incident, and there is no requirement that the supervisor indicate which of the involved officers used force. This, in addition to the fact that there is only one space provided for a disciplinary recommendation, may result in a supervisor failing to evaluate each individual officer's role in the incident. The DPD does not use PCRs or PAIRs to count or track uses of force, and it would be extremely difficult to do so because PCRs are not numbered consistently and PAIRs are not numbered, and PCRs and PAIRs are sometimes used to report multiple uses of force, are also used to report other police actions, and are not entered into a computerized database.

We recommend that the DPD explicitly require officers to report all uses of force, aside from un-resisted handcuffing, regardless of whether there is a visible injury or complaint of injury. The DPD should create a use of force form that officers would be required to use to report all uses of force. The form should only be used to record uses of force, not other police action. The DPD should require supervisors to review and evaluate in writing each use of force by each officer under their supervision. This could be accomplished by revising the PAIR so that the PAIR clearly records each individual use of force and which officers used force, and requires an individualized assessment and recommendation regarding each officer. We recommend that the use of force forms and PAIRs be numbered and entered into a computerized database to allow uses of force to be tracked, and, as discussed further below, recorded in an early warning system (EWS). The DPD should adequately train all officers in use of force reporting, and, specifically, in the use of the new use of force form.

II. External complaints

An adequate external complaint process is a crucial oversight mechanism and an important deterrent of misconduct. The Office of the Chief Investigator (OCI), a component of the Board of Police Commissioners (BPC),[11] is responsible for investigating external complaints. Some aspects of the DPD's external complaint process have the potential to discourage the filing of complaints, and to impair their effective tracking and resolution.

## A. Intake and tracking of external complaints

DPD policies permit an individual to file a complaint with the OCI or a DPD precinct or section. Those who wish to file a complaint with a DPD precinct or section may only do so by speaking to a supervisor, who will complete a Citizen Complaint Report (CCR), the DPD's complaint form. Members of the public may not complete complaint forms themselves; in fact, complaint forms are not available to the public. The DPD does not explicitly prohibit DPD officers from refusing to accept external complaints or from discouraging members of the public from filing complaints.

DPD supervisory officers are permitted to resolve some external complaints informally, a practice that may lead to under-reporting of complaints. DPD policy apparently prohibits supervisory officers from informally resolving complaints alleging "misconduct," although the policy does not define "misconduct." Based on our review of precinct desk blotters, it appears that supervisory officers sometimes informally resolve complaints that allege behavior which should be characterized as misconduct. DPD policy requires that complaints resolved informally be recorded in precinct desk blotters, and that these complaints be referred to the OCI in a memo. However, according to the OCI, precincts do not always send these memos to the OCI. The OCI does not review or track complaints that are resolved informally at the precinct level. These complaints are not given a number or entered into the OCI's computer database, which is used to track complaints by officer, and which the OCI plans to use as an EWS.

The OCI also attempts to resolve complaints informally. If a complaint is resolved informally by the OCI, the complaint is recorded in a log book, but it is not given a number, nor is it entered into the computer database. The OCI does not enter any complaints in its database until the investigation is complete and a final disposition is reached. As a result of these practices, the OCI does not have the ability to track informally-resolved complaints by officer, nor have a complete count of external complaints. Moreover, the ability of the computer database to function as an EWS is compromised (discussed more fully in section IV. B. supra).

We recommend that the DPD adopt and implement the following policies: members of the public should be able to file complaints by telephone, facsimile, electronic or regular mail, or in person, by speaking with a supervisor, an OCI investigator, completing a complaint form themselves, or providing relevant information in narrative form; complaint forms should be available and information regarding the complaint process should be posted in a visible, public place in DPD precincts, other DPD commands, the OCI, and other public buildings, including, for example, City Hall and libraries; complaint forms and other relevant materials should be made available to community groups upon request; DPD officers should carry written materials regarding the external complaint process in their patrol cars; DPD policy should require officers to provide complete and accurate information regarding the external complaint process, including written materials, to members of the public who request information about filing a complaint; and officers should be explicitly prohibited from refusing to accept external complaints, and from discouraging members of the public from filing complaints.

We further recommend that the DPD provide training on handling external complaints and interpersonal skills to DPD personnel with responsibility for receiving complaints. We recommend the DPD enforce its existing policy prohibiting the informal resolution of complaints alleging misconduct. We recommend that DPD policy define "misconduct" to ensure that appropriate complaints are fully investigated. This could include criteria for excluding complaints asserting only that the seizure was improper solely because the complainant is not guilty of a traffic or parking violation. We recommend that the DPD require all misconduct complaints to be recorded on complaint forms and promptly referred to the OCI; and that all relevant information regarding all misconduct complaints be entered in the OCI's computerized database and the EWS immediately upon receipt by the OCI. This information should be updated as more information becomes available.

B. External complaint investigations

The OCI employs both sworn and civilian investigators. While the DPD apparently conducts background investigations on all civilian investigator applicants, the OCI has no eligibility criteria for sworn investigator applicants related to their complaint and disciplinary histories. Such criteria ensure that only officers with the highest ethical standards serve as investigators. Many OCI investigators are civilians and have never received any formal investigative training. The OCI does not provide mandatory, pre-service training to new civilian or sworn investigators, nor mandatory, periodic, in-service training to current civilian or sworn investigators.

In some cases, the OCI does not investigate complaints, which may result in a failure to investigate misconduct. The OCI does not investigate complaints filed by complainants who later wish to withdraw their complaint, who are subsequently unwilling to cooperate, or whom the OCI is unable to locate. In such cases, the investigations are closed, regardless of the merit of the complaint. Moreover, it is unclear whether the OCI investigates anonymous complaints, because there is no policy addressing whether such complaints should be investigated; this may prevent the investigation of valid complaints.

We have identified the following issues regarding OCI's investigative policies and practices that may affect the quality of OCI investigations. Historically, the OCI sent written questions to all officers who were the subject of a complaint, as well as all witnessing officers, rather than conducting in-person interviews. The OCI has recently amended this policy to require in-person, tape-recorded interviews of officers who are the subject of a use of force complaint; other interviews of officers continue to be conducted by written questions. Conducting interviews by written questions is often an inadequate investigative practice because it does not permit an assessment of credibility, does not allow for immediate follow-up questioning, and may produce "canned" responses. In addition, there is no written policy governing when OCI investigators should compel statements from officers pursuant to *Garrity v. New Jersey*, 385 U.S. 493 (1967). Investigators seem uncertain about when it is appropriate to do so. Currently, interviews of complainants are conducted on the telephone or in person, and are not recorded, which may lead to inaccurate reporting of interviews, and disputes over the content of interviews. Finally, the OCI does not review the relevant complaint or disciplinary history of an officer who is the subject of a CCR, which might prevent investigators from discovering a pattern of problematic behavior by an officer or unit.

Our interviews revealed that some investigators and officers were uncertain when the OCI or a DPD supervisory officer should refer an external complaint to the Internal Controls Section (ICS).[20] DPD policy apparently requires that all complaints containing allegations of criminality by DPD personnel should be referred to the ICS, but some investigators told us that referral would depend upon the level of force used, e.g., a punch would require referral, while a chemical spray discharge would not.

We recommend that the OCI establish eligibility criteria for sworn investigator applicants pertaining to their complaint and disciplinary history; remove investigators whose actions while serving as investigators would have disqualified them from selection as investigators; and provide mandatory, pre-service training to all new investigators and mandatory, periodic, in-service training to all current investigators.

We recommend that the OCI institute the following investigative policies and practices: for all complaints alleging misconduct, require investigators to conduct in-person, recorded interviews with all complainants, witnesses, and officers who are the subject of such complaints; require that all complaints alleging misconduct, including, anonymous complaints, withdrawn complaints, and complaints filed by complainants who are unwilling to cooperate with the OCI or whom the OCI is unable to locate, are investigated to the extent reasonably possible to determine whether or not the allegations can be resolved; create written guidelines regarding when to compel statements pursuant to Garrity that ensure the integrity of potential

criminal investigations, and train investigators in them; and require investigators to review the relevant complaint and disciplinary history of all officers who are the subject of a complaint.

The DPD should issue guidelines clarifying when the OCI or a DPD command should refer a complaint to the Internal Controls Section, and train supervisory officers and investigators in these guidelines.

## C. Disposition of external complaints

After the OCI investigates a CCR, the matter is referred to the Board of Police Commissioners (BPC). By City Charter, the BPC has the absolute authority to make findings in the case and, if a complaint is sustained, makes a recommendation regarding the imposition of discipline. However, the Police Chief can effectively override the BPC's findings, without a written explanation, by imposing no discipline.

Complainants are notified of the disposition of complaints they have filed, but not the reasons for the disposition, or whether the subject officer is disciplined or other corrective action is taken. The BPC and the OCI do not provide a forum in which complainants can register their opinion if they are dissatisfied with the resolution of their complaint.

We recommend that the Chief of Police be required to provide a written explanation to the BPC when he or she chooses not to impose discipline on an officer who is the subject of a sustained complaint. This policy will foster improved communication between the BPC and the Chief regarding policing practices. We recommend that the OCI notify a complainant of the status of his/her complaint after a fixed period of time, notify the complainant of the ultimate disposition of his/her complaint and the reasons for the disposition when a disposition is reached, and notify the complainant whether discipline was imposed or other corrective action was taken on the subject officer at the time of such action. The BPC or the OCI should provide an opportunity for complainants to register their opinion if they are dissatisfied with the resolution of their complaint.

## III. Criminal and Internal Investigations

Thorough and complete criminal and internal investigations ensure that a law enforcement agency identifies and addresses instances of police misconduct. The ICS is responsible for criminal and other internal investigations. The ICS was downsized in 1994 from a bureau, when it was headed by a deputy chief, to a section, which is headed by an inspector. Some DPD officials informed us that the downsized ICS has insufficient authority and stature to perform its function effectively. For example, one official told us that if a precinct commander is not responsive to an investigation of officers under his/her command, the ICS might have difficulty addressing this situation because the head of the ICS, an inspector, is outranked by the precinct commander.

The ICS does not have eligibility criteria for investigator applicants pertaining to their complaint and disciplinary history. As discussed above, such criteria help to ensure that officers who have engaged in misconduct are not investigating allegations of misconduct. The DPD does not provide mandatory, pre-service training to new ICS investigators, nor mandatory, periodic, in-service training to current ICS investigators.

It is important to ensure that investigations of alleged criminal misconduct and other high-risk incidents are conducted by an independent office with no potential conflicts of interest. While DPD policy apparently permits referrals to the ICS in cases deemed appropriate by a supervisory officer, the DPD does not require the referral of uses of force, aside from police shootings, to the ICS. Therefore, DPD investigations of alleged criminal misconduct may be conducted by officers in the same command as the officers who allegedly engaged in the misconduct, creating a potential conflict of interest. The ICS only regularly rolls out and investigates police shootings and in-custody deaths.

The ICS apparently does not investigate complaints that are anonymous, withdrawn, filed by a complainant who is unwilling to cooperate with ICS investigators, or filed by a complainant whom ICS investigators are unable to locate. In such cases, the ICS will close the investigation. Additionally, there is no written policy governing when ICS investigators should invoke Miranda or Garrity in interviewing officers, including whether they should consult with the Wayne County Attorney's Office in this regard, and investigators seem uncertain about when to do so. Based on our interviews, it appears that investigators sometimes compel statements pursuant to Garrity even when they suspect criminality. This practice jeopardizes potential criminal prosecutions because the DPD does not separate the criminal and administrative investigations of potentially criminal incidents. The Special Investigations Unit (SIU), which investigates police shootings, does not record interviews.

Before opening an investigation, the ICS conducts a preliminary investigation to determine whether they believe a full investigation is warranted. The ICS does not include such preliminary investigations in their computerized database, and does not plan to include them in the Early Warning System ("EWS"). Preliminary investigations are not numbered and are not listed on index cards that record officer contacts with ICS. These practices undermine the ability of ICS investigators to identify patterns of problematic behavior. Preliminary investigations should be tracked in an EWS because the repeated appearance of similar allegations may reveal the need for non-disciplinary corrective action to be taken before the investigation is completed (discussed more fully in section IV. B. supra).

We recommend that the DPD take appropriate measures to ensure that the office charged with conducting internal investigations has sufficient authority and stature to function effectively.

The ICS should establish eligibility criteria for investigator applicants pertaining to their complaint and disciplinary history. The ICS should remove all investigators whose actions while serving as investigators would have disqualified them from selection as investigators. The DPD should provide mandatory, pre-service training to all new ICS investigators, and mandatory, periodic, in-service training to all current ICS investigators.

All uses of force should be referred to the ICS. The ICS should investigate all uses of force in which the subject is visibly injured or complains of pain, or that require hospitalization or result in death, and all firearm discharges, except discharges in the course of training or certification. After initial review, the ICS should be permitted to delegate investigations of other uses of force. The ICS should roll out and investigate all firearm discharges, except discharges in the course of training or certification, and all uses of force that require hospitalization or result in a death.

The ICS should investigate, to the extent reasonably possible, all complaints alleging misconduct that are anonymous, withdrawn, filed by complainants who are unwilling to cooperate with ICS investigators, or filed by complainants whom ICS investigators are unable to locate. The DPD should create guidelines clarifying when investigators should invoke Miranda or Garrity in interviewing officers to protect the integrity of potential criminal investigations, and train all investigators in these guidelines. In investigating misconduct complaints, the ICS should adequately document (e.g., tape- or video-record) all interviews with witnesses and officers. The ICS should include preliminary investigations in their computerized database and the EWS, number preliminary investigations, and list them on ICS contact cards. In order to avoid any improper negative inferences being drawn about an officer or unit, the EWS should clearly indicate that the investigations are preliminary, and the EWS should be updated as more current information becomes available. For example, when the ICS decides to open a full investigation, the EWS should be updated to reflect this, and when the ICS reaches a disposition in an investigation, the EWS should be updated to reflect this.

**IV. Supervisory oversight**

## A. Risk assessment and management

In the late 1990's, the DPD abolished the Risk Management Division and relocated the Risk Assessment Section to the Legal Affairs Division, effectively downsizing the office performing the risk management and assessment functions from a division to a section. Based on our review, the risk assessment processes currently in place in the DPD are periodic meetings between the Police Legal Advisor and the head of the Risk Assessment Section to review recently settled lawsuits, and informal reviews of officers under their command by some commanders. The DPD apparently does not have a risk management plan nor does it provide any risk management training to supervisory officers, even though DPD policy requires the Risk Assessment Section to develop risk management plans and programs and provide risk management training. The DPD does not have any mechanisms to facilitate intra-departmental information sharing regarding training, risk assessment and management, planning and policy review. The DPD does not review high-risk incidents, such as police shootings and in-custody deaths, from a risk assessment perspective. While individual command-level officers may conduct inspections of their commands, it appears that no office in the DPD coordinates and conducts inspections. The Planning and Inspection Unit, which is charged with performing this function, does not do so.

We recommend that the DPD create, implement, and regularly update a risk management plan. This plan should provide for an EWS; regular, periodic inspections of all DPD commands; regular, periodic audits of, among other things, use of force reporting, training, external complaint intakes and investigations, criminal and other internal investigations, and the disciplinary process; command-level risk-assessment reviews of all high-risk incidents, and improved information sharing regarding training, risk assessment and management, planning, and policy review. The DPD should provide risk assessment and management training, including training regarding the EWS, to all supervisory staff. The DPD should consider consolidating under one command all offices with functional responsibility for training, risk assessment, planning, and policy review.

## B. Early warning system

An early warning system (EWS)[9] is a critical component of a risk assessment and management system. The DPD does not have a fully operational EWS, or other method by which to identify patterns of problematic behavior by an officer, shift, or unit. DPD officials recognize the need for an EWS, and the DPD has been in the process of creating a computerized EWS for several years. We were told that a partial EWS is now on-line. This system currently only contains historical data on citizen complaints, although the DPD intends to input other historical data. In the interim, it is more difficult for the DPD to identify at-risk officers or units at an early stage, increasing the likelihood of misconduct.

Our review of the DPD's plans for an EWS revealed deficiencies that will significantly limit the EWS's effectiveness. The DPD apparently does not plan for the EWS to contain information on non-sustained complaints, uses of force, criminal arrests and charges, civil lawsuits, arrest reports, training history, or referrals for administrative counseling. It is important that the EWS contain information on non-sustained complaints because a number of such complaints containing similar allegations may indicate that an officer is engaged in a pattern of problematic behavior and/or is at risk of engaging in misconduct. Also, as explained above, the DPD apparently does not plan to include in the EWS information regarding preliminary investigations and regarding complaints unless sustained. As discussed above, it is important that the EWS contain the most recent available information to ensure that the EWS can flag patterns of problematic behavior before misconduct takes place. Delaying the input of information into the EWS until a full investigation is opened or until a final disposition is reached might prevent the DPD from identifying an at-risk officer and taking non-disciplinary corrective action, e.g., retraining, before he/she engages in misconduct. A police department can prevent improper negative inferences from being drawn from such

information by clearly indicating the status of the information, e.g. non-sustained complaint, preliminary investigation, and by updating the EWS as more current information becomes available.

The DPD will provide inadequate access to the EWS. The system will contain files from the OCI, the ICS, and the precincts, but each office will only have access to their own files in the database, preventing supervisors from obtaining comprehensive data about an officer or unit. We received conflicting information from different sources, but it appears that the Risk Assessment Section will have access to the entire database.

The DPD's plan for using the EWS will significantly limit its utility as an oversight mechanism. The Risk Assessment Section, which will administer the EWS, is inadequately staffed to effectively perform this function. Most computerized early warning systems incorporate flags that trigger supervisory review. The flags that the DPD is planning to use are inadequate because they set the trigger for review too high, and only take into consideration external complaints, excluding other data that may signal problematic behavior. The only flag that the Risk Assessment Section will use is three CCRs in six months (as noted above, a CCR is not entered in the database until a disposition is reached). The OCI's flag will be two CCRs in three months, while the ICS will have its own flag, which has yet to be determined. The DPD apparently does not plan to require supervisory review of EWS data for officers who are being considered for promotions, transfers, or selection as an ICS investigator, an OCI investigator, or a FTO. The DPD apparently does not plan to require investigators to review an officer's relevant EWS data before reaching a disposition in an investigation of that officer, nor to require supervisors sitting in the disciplinary hearing of an officer to review that officer's relevant EWS data. It does not appear that the EWS will create a common control number for incidents that are the subject of several reports or investigations.

We recommend that the DPD invest additional resources in the computerized EWS to ensure its completion at the earliest date possible. We recommend that the EWS contain information on all investigations, including preliminary investigations, all complaints, including non-sustained complaints and complaints prior to final disposition, uses of force, criminal arrests and charges, civil lawsuits, arrest reports, training history, discipline, and other corrective actions. We recommend that the ICS, the OCI and Risk Assessment have full read-only access to the EWS; and that supervisors have read-only access to EWS data regarding officers that they supervise.

We recommend that the DPD revise its plan for using the EWS as follows: the DPD should staff the Risk Assessment Section adequately to administer the EWS; the DPD should develop additional flags for the EWS based on the accumulation of various types of conduct, not just external complaints, or require supervisors to review the EWS data of an officer every time that officer uses force or receives an external complaint; if the DPD chooses to use flags, all offices that use the EWS should generate regular reports based on these flags; the DPD should require supervisors to review regularly the EWS data of officers they supervise; the DPD should require supervisors to review the EWS data of officers under their supervision who are being considered for promotion or for selection as FTOs, or who are transferring into their command; the DPD should require the OCI and the ICS to consider EWS data regarding officers who apply for investigator positions in their offices; the DPD should require that, before reaching a disposition in an investigation of an officer, the investigator review the officer's EWS data that is relevant to the subject of the investigation, and that all supervisors sitting in the disciplinary hearing of an officer review that officer's EWS data that is relevant to the subject of the investigation before ruling; and the EWS should create a common control number for incidents that are the subject of several reports or investigations.

C.  Policy planning

Effective policy planning is an important element of supervisory oversight that can decrease the risk of police misconduct. The DPD Manual, which is issued to all officers, has not been updated to reflect many

changes in policy, e.g., the manual does not reflect the major departmental reorganization of 1994. The DPD does not regularly review its policies to ensure their compliance with current law, internal consistency, and adequacy in light of risk assessment information. The DPD does not review commands' Standard Operating Procedures (SOPs) to ensure their consistency with DPD policies. There is no central repository for DPD policies; DPD policy requires the Planning and Inspection Unit (PIU) to collect all DPD policies, but the PIU does not have the SOPs of many commands. The PIU, which also has responsibility for revising and updating the manual, is understaffed. It was downsized from a section to a unit in 1994.

We recommend that the DPD regularly review and update its policies, and review its SOPs to ensure their consistency with DPD policies. The DPD should ensure that all sworn officers have updated manuals, and that officers are trained in revised policies. The DPD should ensure that there is an office that serves as the central repository for all policies, including SOPs, and that this office has procedures in place to ensure that it has all policies. The DPD should provide adequate staffing and resources to the office that is charged with performing the above functions.

## V. Discipline

Our review revealed that there is a significant backlog of disciplinary cases. According to DPD officials, the backlog is approximately 1-2 years for cases awaiting initial hearings, and approximately 2-3 years for cases awaiting BPC appellate hearings. Documents provided by the DPD and the Law Department indicate that, in some cases, alleged offenses that took place over three years ago are still awaiting initial hearings at Trial Boards or Chief's Hearings, while some alleged offenses that took place over four years ago are still pending appeals to the BPC.

Many command-level officers expressed great frustration with the disciplinary backlog, saying that it hinders the ability to impose discipline, and significantly reduces the deterrent effect of discipline. Some command-level staff opined that the backlog for BPC appeals is particularly long because the BPC only meets for one hour weekly, and only schedules two appellate hearings per month.

The DPD and the Law Department do not have guidelines regarding the amount of time necessary to process a disciplinary case. Based on our review, Trial Boards are usually scheduled for only one day, although they often last longer than that. This practice apparently results in frequent continuances during Trial Boards. Settlement negotiations rarely take place until the day that a disciplinary hearing is scheduled, eliminating the possibility that settlements could reduce the disciplinary backlog.

The DPD and the BPC should take steps to reduce the backlog of disciplinary cases, including reducing the length of time between alleged offenses, Chief's Hearings, Trial Boards, and BPC appeals. The DPD and the BPC should schedule Chief's Hearings, Trial Boards, and BPC appeals more frequently, and establish guidelines dictating the maximum period of time that should elapse between each stage of the disciplinary process. The DPD and the Law Department should schedule Trial Boards for as many days as they are likely to last. The DPD and the Law Department should take measures to encourage settlements prior to disciplinary hearings, e.g., establish pre-disciplinary hearings, as suggested by the Law Department.

## VI. Training

### A. Field Training

Field training for new officers is an integral component of a training program, which helps to minimize the risk of officers engaging in problematic behaviors, including the use of excessive force. We understand that the DPD has an insufficient number of Field Training Officers (FTOs). Many probationary officers do not have FTOs, or have FTOs for only a portion of the field training program. Some officers expressed the opinion that there are not enough FTOs because the DPD provides inadequate incentives for officers to

become FTOs. The DPD has no eligibility criteria for FTOs pertaining to FTO applicants' complaint and disciplinary histories. Such eligibility requirements help to ensure that officers who have engaged in misconduct do not train new officers.

We recommend that the DPD take measures to recruit and train more FTOs, including providing additional incentives to encourage officers to apply to become FTOs. Possible incentives include greater monetary compensation or priority for receiving training. The DPD should establish FTO eligibility criteria that consider applicants' complaint and disciplinary histories. The DPD should also remove FTOs whose actions while serving as FTOs would have disqualified them from selection as FTOs. We also recommend that the DPD solicit anonymous evaluations of FTOs from probationary officers, which would assist the DPD's efforts to evaluate FTOs and improve the FTO program.

B. In-service training

DPD officers could benefit from receiving more in-service training than is currently provided. Aside from firearms certification, there is no mandatory, periodic, department-wide, in-service training. The DPD's firearms certification program requires officers to be certified in firearms annually. Our review, however, indicates that the DPD does not certify all officers in a given year, in violation of DPD policy. According to the Firearms Training Unit, approximately 75% of sworn officers are certified in firearms each year. Apparently, there are no measures in place to ensure that all officers are certified in firearms annually. DPD policy permits an officer who has not been certified to continue to carry a firearm.

Due to the infrequency with which officers use firearms, and the serious risk involved in using firearms, we recommend that the DPD require all sworn officers to be certified in firearms at least semiannually; that the firearms certification include testing on use of force decision-making skills; that the DPD institute measures to ensure that all officers are certified semiannually; and that the DPD prohibit officers who have not been certified from carrying firearms. We also recommend that the DPD provide additional, mandatory, annual, in-service training, including training on the use of force, legal developments, diversity, and police integrity. Use of force training should train officers only to use reasonable force and instruct them in de-escalation techniques that can help them avoid using force or minimize the amount of force used. The DPD should document and ensure that all sworn officers have successfully completed the training.

Thank you again for the continued cooperation of the Law Department and the DPD. We look forward to working with you and the DPD in the coming months as our investigation proceeds.

Sincerely,

Steven H. Rosenbaum
Chief
Special Litigation Section

Jeffrey G. Collins
United States Attorney
Eastern District of Michigan

cc:  The Honorable Kwame M. Kilpatrick
      Chief Jerry A. Oliver, Sr.

1. Pursuant to the City Charter and DPD policy, the BPC, whose five members are appointed by the Mayor, oversees the DPD.

2. The ICS, which is discussed below, is responsible for criminal and internal investigations of DPD officers.

3. An EWS is a relational data system, usually computerized, for maintaining, integrating, and retrieving information necessary for effective supervision and management of a police department and its personnel. A police department can use EWS data regularly and affirmatively to promote best professional police practices, accountability and proactive management; to manage the risk of police misconduct, and potential liability therefor; to evaluate and audit the performance of officers and units; and to identify, manage, and control at-risk officers, conduct, and situations.

>

*Updated August 6, 2015*

---

Was this page helpful?

Yes    No

{01420207.DOCX}

# EXHIBIT 2

David Whitaker, Esq.
   Director
Irvin Corley, Jr.
   Executive Policy
Manager
Marcell R. Todd, Jr.
   Senior City Planner

LaKisha Barclift, Esq.
Kemba Braynon
Elizabeth Cabot, Esq.

# City of Detroit
## CITY COUNCIL
### LEGISLATIVE POLICY DIVISION
208 Coleman A. Young Municipal Center
Detroit, Michigan 48226
Phone:  (313) 224-4946   Fax:  (313) 224-4336

Janese Chapman
Derrick Headd
Anne Marie Langan
Gregory Moots
Julianne Pastula, Esq.
Jerry Pokorski
Sabrina Shockley
David Teeter
Kathryn Underwood

**TO:**       The Honorable City Council

**FROM:**   David Whitaker, Director
              Legislative Policy Division Staff

**DATE:**   February 14, 2014

**RE:**      **Detroit Detention Center**

The Legislative Policy Division was requested to provide an overview of the interagency agreement between the City of Detroit/Detroit Police Department (DPD) and the Michigan Department of Corrections (MDOC).

In June 2003, the City entered into a Consent Judgment with the Department of Justice regarding conditions of confinement for DPD.  This consent judgment requires DPD to make a number of changes to the way arrestees are housed and treated while confined.  A decision was made within DPD that it was within the City's best interest to remove itself from the business of housing arrestees.  Initially, the City had planned to contract with Wayne County to house arrestees.  However, according to DPD in negotiating a deal to provide this service, it was found that MDOC had a more competitive price.

Emergency Manager Orr, on behalf of the City of Detroit, entered into the interagency agreement with MDOC in April 2013[1] to house DPD's detainees.[2] Until the initiation of the contract with MDOC, the City still housed its arrestees within the police precincts throughout the City.  At this time, the City no longer houses any arrestees in the police precincts.  It has been indicated that through this interagency agreement, the City has made strides toward the successful completion of the provisions in the consent judgment.

This is a five-year agreement for the leasing of the Detroit Detention Center (DDC) which consists of two (2) buildings of the former Mound Correctional Facility located at 17601

---

[1] The agreement was amended on August 8, 2013.  The discussion of the agreement between MDOC and DPD incorporates these amendments.  For completeness, LPD states that City Council has not been asked to approve this interagency agreement.  The instant report is being provided at City Council's direction for informational purposes.
[2] The *Interagency Agreement Between The City of Detroit/Detroit Police Department and The Michigan Department of Corrections for the City of Detroit Detention Center"* and the First Amendment to the Agreement have been attached for reference

1

Mound Road, Detroit, MI 48212 totaling 56,544 square feet.[3]  The total five-year cost of the agreement is $41 Million, or $8,126,600 per year, that will be paid in monthly installments of $677,216 per month.[4]  Past due payments will be assessed a late fee of one-half of one percent (0.5%) of the delinquent amount for the first month and one percent (1%) for each succeeding month.[5]  Additionally, DPD shall make a one-time payment of $650,000 to make physical plant changes. The City is obligated to obtain the minimum level of insurance, including Worker's Compensation Insurance[6], as required by law.  MDOC may approve the use of the City's self-insurance program in place of purchasing insurance where appropriate.[7]  "Each party is responsible for the acts or omissions of their respective employees."[8]

The agreement contains provisions addressing the breach of contract by the City.  MDOC is required to provide DPD written notice of the breach and give not less than 30 days to cure the breach.[9]  "The notice of breach and opportunity to cure is inapplicable for successive or repeated breaches or if MDOC determines in its *sole discretion* that the breach poses a serious and imminent threat to the health or safety of any person or imminent loss, damage, or destruction of any real or tangible personal property."[10] (emphasis added)  It should be noted that the agreement contains no provisions that address a breach on the part of MDOC.

The agreement may be terminated in whole or in part by either party with 180 days notice.[11]  The termination must specify one of the following reasons:

- An Executive determination has been made either that the purpose for which the Agreement was entered into no longer exists or that sufficient funds do not exist for meeting the consideration obligations
- Damage or destruction is so extensive as to exceed 50% of the replacement value of the leased premises
- Termination for convenience
- Breach of a material condition
- Security Concerns
- Non-Appropriation of funds
- Bankruptcy
- Upon an order of a court of competent jurisdiction.

It also provides for the following security, housing, food and maintenance services necessary to operate the facility on a 24 hour, 7 days a week, 365 days a year basis[12]:

---

[3] . It must be noted that the Mound Correctional Facility was originally designed as a "correctional facility" and not as a holding or detention facility.  It is not known whether adoptive modifications were used or necessary to accommodate this present use.

[4] Addendum Section 2.

[5] Id.  The $650K was payable in two installments, one for $450K due on August 1, 2013, and $200K due on September 1, 2013.  Both payments should already have been remitted per the term of the agreement.

[6] Section 65.  "No Co-employer/Employee Relationship – DPD must acknowledge that neither this Agreement nor any subsequent amendment creates a co-employer/employee relationship between DPD and the State of Michigan, MDOC, its departments, divisions, agencies, sections, commissions, officers, employees or agents."

[7] Section 44.

[8] Section 46.

[9] Section 47.

[10] Id.

[11] Section 49.

[12] Page 3. *Purpose* b.

- Provide complete maintenance of facility, includes janitorial, pest control and exterior grounds maintenance
- Provide physical plant, includes heating, cooling, utilities, illumination, plumbing, telecommunications
- Provides custody staffing, includes correctional officers, housing officers, command positions
- Provides medical staffing,
- Provides food and food services
- Collection of DNA samples from each detainee arrested for a violent felony in accordance with MCL 750.520m(1)(a)
- Additionally, this allows for space for hold equipment and to perform ancillary police work. The following equipment must be provided by DPD: not less than five (5) live scan machines/systems for the printing/booking of arrestees;
- Video arraignment equipment
- Breathalyzer machines
- Audio/video recording equipment
- Stationary security video cameras

Pursuant to the Revised Exhibit 2 *Transfer of Arrestees to MDOC at the DDC,* the Michigan State Police (MSP) Troopers, Motor Carrier Officers or DNR officers are authorized to lodge any person arrested in Wayne County or arrested pursuant to warrant issued by a Wayne County district or circuit court in the DDC. It should be noted that the City of Detroit is bearing 100% of the cost of maintaining and operating the DDC even though MSP will be utilizing the facility for its operation. While it is indicated that the MDOC is responsible for the detainee's belongings, it is not made clear which entity will be responsible for any medical costs associated with care needed by an arrestee. Nor is it clarified whether the City would be indemnified for any liability stemming from the housing of MSP's arrestees.

This interagency agreement has been entered into by the Emergency Manager and is intended to help the City in its effort to dissolve the consent decree relative to conditions of confinement with the Department of Justice. It has been indicated that this contract is a savings over similar services being offered by Wayne County.

If there are additional questions, please advise.

3

{01420207.DOCX}

# EXHIBIT 3

**INTERAGENCY AGREEMENT
BETWEEN
THE CITY OF DETROIT/DETROIT POLICE DEPARTMENT
AND
THE MICHIGAN DEPARTMENT OF CORRECTIONS
FOR THE
CITY OF DETROIT DETENTION CENTER**

THIS INTERAGENCY AGREEMENT (Agreement) is entered into under the authority of the Emergency Financial Manager (EFM), Kevyn Orr on behalf of the City of Detroit/Detroit Police Department (the City/Lessee), located at 200 Coleman A. Young Municipal Center, Detroit, MI 48226 and the Michigan Department of Corrections (MDOC/Lessor) whose address is 206 East Michigan Avenue, Lansing, MI 48933 pursuant to the authority granted to the EFM pursuant to 1990 PA 72 and 2012 PA 436 and MCL 791.203 of the Correction Code, 1953 PA 232, MCL 791.201 *et seq.*

The parties, with the encouragement of Governor Rick Snyder, in the interest to protect and serve the public, to provide the most cost-efficient and effective means of housing arrestees, to deter crime, and for the consideration specified in this Agreement for leased space and services, agree to the following terms and conditions:

**DEFINITIONS**

**24/7/365:** means 24 hours a day, seven days a week, and 365 days a year including the 366th day in a leap year.

**Additional Service:** means any services not specifically provided for under this Agreement.

**Audit Period:** the seven year period following any work under the Agreement.

**A.N.S.I.:** American National Standards Institute, Inc., a New York corporation that identifies public requirements for national standards and coordinates voluntary standardization activities. A.N.S.I. standards are used in calculating square footage used in this Agreement.

**Arrestees/Pre-Arraigned Detainees:** Persons age 17 or older who have not yet been arraigned. Arrestees will be accepted on the leased premises by the MDOC from DPD, the Michigan State Police (MSP), or agencies authorized by DPD.

**Cancellation/Termination:** Ending all rights and obligations of the parties except for any rights and obligations that are due and owing.

**Construction:** Assembling of foundation, structural, architectural, electrical, and mechanical systems on the leased premises where none existed prior.

**Contraband:** Prohibited items and property as defined in MDOC policy PD 03.03.105 and 04.07.112.

**DPD:** Detroit Police Department.

**DPD's Improvements:** Remodeling, attachment of fixtures, erection of additions, partitions, structures or signs by DPD in and upon the leased premises after the DPD has acquired possession.

**Executive:** An Executive Order of the governor pursuant to Const 1963, Article 5, § 2 and 20 or a decision by the Director of the Michigan Department of Corrections.

**Maintenance:** That effort, including repair, replacement, or removal, required to keep the leased premises and the appearance of said premises functioning or operating as originally designed, constructed, or installed. Including but not limited to mechanical, electrical, architectural or civil systems within the premises, outside the premises or those systems otherwise attached thereto.

**MSP:** Michigan State Police.

**Occupancy:** Actual physical presence by DPD in the leased premises.

**Possession:** Lawful availability and physical access to install the DPD's furnishings and compliance with the terms and conditions in this Agreement.

**Potable Water:** Water free from impurities present in amounts sufficient to cause disease or harmful physiological effects and conforming in its bacteriological and chemical quality to the requirements of the Public Health Service Drinking Water Standards or the regulations of the public health authority having jurisdiction.

**Remodel:** Includes alterations, renovations, and any related demolition, and is the rearranging of existing architectural, civil, electrical, and/or mechanical systems within the leased premises. Remodeling does not include enlarging or decreasing of structural or foundation systems, or new construction.

**State Government Owned:** The real property consisting of 53.5 acres more or less located at 17601 Mound Road, Detroit, MI 48212 is the property of the State of Michigan, title to which is held by a) the State of Michigan; b) any of the several departments, boards, commissions, offices, or agencies of the executive, legislative or judicial branches of state government; c) the State Building authority; d) any institution of high learning funded in whole or in part by the State of Michigan; or e) any entity created by act of the Legislature as an instrumentality of Michigan State government.

**Tenantable:** Habitable for the effective conduct of the DPD's intended business.

## PURPOSE

The purpose for this Agreement is for the MDOC to:

a.  Lease two buildings to the DPD, within the 53.5 acre fenced perimeter of the former Mound Correctional Facility located at 17601 Mound Road, Detroit, MI 48212, totaling 56,544 square feet; and

b.  To provide those services as enumerated in this Agreement to house up to 200 DPD/MSP arrestees 24/7/365; and

c.  To provide custody and security services to DPD/MSP for those arrestees.

## POSSESSION

1.  The MDOC leases to DPD the building known as the Administration Building, Building #100, located within the 53.5 acre fenced perimeter of the former Mound Correctional Facility at 17601 Mound Road, Detroit, MI 48212, composed of approximately 27,052 square feet more or less.  Building #100 will be used by DPD Detectives and DPD office staff for office administration, suspect interviews, line-ups and other DPD Detective duties.

2.  The MDOC leases to DPD the building known as Building #500, located within the 53.5 acre fenced perimeter of the former Mound Correctional Facility at 17601 Mound Road, Detroit, MI 48212, composed of approximately 29,492 square feet more or less.  Building #500 will be use by DPD for the MDOC to house up to 200 arrestees from DPD and/or the Michigan State Police.  The MDOC will maintain custody of arrestees age 17 or older (150 male and 50 female) and house them 24 hours/day, 7 days per week, 365 days per year while the arrestees await processing, booking court appearances or transport, whose detention shall not exceed 72 hours from the time of booking.

3.  For the duration of this Agreement, the leased premise will be known as the DETROIT DETENTION CENTER (DDC).

4.  The MDOC will provide parking on the leased facility premises at two locations for staff and visitors.  One parking lot is located north of the South entrance on Mound Road.  The second parking lot is located south of the South entrance on Mound Road.  These paved parking lots combined, provide parking for approximately 200 motor vehicles.

5.  DPD upon payment of the consideration specified herein and upon performing all covenants, shall and may peacefully and quietly have, hold and enjoy the leased premises (Building #100) and jointly enjoy Building #500 for the term of this Agreement or any extension.

3

6. The MDOC or its agents may enter the leased premises without advanced notice for the purpose of conducting repairs, preventative maintenance, providing replacements, to restore order or for any other reason it deems necessary.

7. Right to Expansion – The parties reserve the right to negotiate expansion of the space and services outlined in this Agreement, subject to appropriations.

**TERM**

8. The MDOC shall furnish the leased premises with its appurtenances to the DPD for a five (5) year initial term of possession commencing _____, 20__ and ending on _____, 20__. This Agreement may, at the option of the parties, be extended for two (2), one-year (1) options, under the same terms and conditions except for the rent as noted in the Consideration section, provided notice is given in writing to the MDOC no less than 120 days before the expiration of the Agreement.

**MDOC OBLIGATIONS**

9. The MDOC shall: (and the cost thereof shall be included as the actual fee charged to DPD):

   a. Provide complete control of facility operations (security, control, housing, food, programs, services, physical plant) and maintenance of the leased premises.

   b. Ensure proper storage, maintenance, and control of critical tools and caustic materials.

   c. Provide heating, mechanical ventilating, cooling, and humidification system at all times occupied.

   d. Provide electrical power distribution system throughout the premises for the operation of all business machinery and equipment.

   e. Provide natural and/or artificial interior illumination that provides a minimum 50 foot-candles, measures at desk level throughout the leased premises.

   f. Provide domestic plumbing system to restrooms and break rooms capable of supplying hot and cold water, and removing sanitary waste water. Hot water delivery shall not be more than 120 degrees F and not less than 110 degrees F.

   g. Provide potable water which shall meet the requirements of the Safe Drinking Water Act, 1976 PA 399, MCL 325.1001 *et seq.*

4

h.   Provide metered utilities for electricity, natural gas, water, sewerage, steam, fuel oil, or coal, seven days per week.

i.   Provide commercial grade, heavy-duty locking hardware.

j.   Provide telecommunications systems and Internet Technology support services.

k.   Provide alarm system monitoring and maintenance.

l.   Provide pest control, including but not limited to: insects, rodents, flying animals, etc.

m.  Provide trash removal from office waste baskets, dumpsters, or equivalent containers.

n.   Provide exterior grounds maintenance, including grass and weed cutting, clippings removal, leaf raking, litter removal, sidewalk surface and parking lot surface maintenance, de-icing, and snow removal.

o.   Provide janitorial supplies, equipment, personnel, and supervision to provide cleaning services to provide for the cleaning of horizontal services, floors, carpeting, modular furnishing tops, desk top surfaces, walls, doors, door hardware, windows and any window coverings, restrooms, break rooms, wastebaskets, drinking fountain fixtures. Janitorial supplies include and are not limited to toilet tissue, hand soap, a means for drying hands, waxes, strippers, sealers, etc.

p.   Provide MDOC custody staff, including but not limited to corrections officers, housing officers, shift command positions, adequate for the intake, custody, placement, secure housing and feeding of up to 200 arrestees (150 males and 50 females) age 17 or older, 24 hours/day, 7 days/week, 365 days a year on behalf of DPD.  Female arrestees shall be housed separately.

q.   Provide staff to safely control movement of arrestees, staff and visitors without jeopardizing the integrity of the leased premises.  Perimeter entrances shall be locked, except when used for the controlled admission or exit of employees, arrestees, authorized deliveries, visitors and emergencies.

r.   Provide MDOC medical staff adequate to provide on-site minor medical treatment and medication to arrestees with minor injuries/ailments.

s.   Provide personal hygiene products to arrestees.

5

t.  Purchase and maintain a sufficient inventory of clothing in multiple sizes for both male and female offenders and provide all laundry services and associated costs.

u.  Provide food and food services for arrestees.

v.  Provide temporary storage for arrestee personal property.

w.  Permit DPD 24/7/365 access to arrestees.

x.  Provide access to telephone(s) pursuant to MDOC policy.

y.  May place DDC information on its website for the public.

z.  Will respond to all arrestee correspondence, including kites and grievances.  The MDOC will also maintain a record of complaints made by arrestees and the public along with responses issued.

aa.  Will provide an inventory list of all MDOC office furnishings located in the leased premises for use by DPD.  Upon expiration or termination of the Agreement, an inventory list of MDOC office items will be provided by DPD to the MDOC.  Any missing or damaged items will be paid by DPD.

 bb.  Provide space adequate:

1. For a work station for DPD staff 24/7 to perform reviews for probable cause for all arrestees.
2. To accommodate two (2) breathalyzer machines.
3. For eight (8) interrogation rooms.
4. For DPD to conduct line-ups with access for civilians to view line-ups.
5. For four (4) attorneys visiting rooms.
6. For four (4) work stations for DPD and investigative personnel to prepare documents and provide access to booking/mug shot data.

cc.  Collection of DNA Samples:

The MDOC will collect a DNA sample from each detainee in accordance with MCL 750.520m(1)(a) for those individuals arrested for a violent felony as that term is defined in MCL 791.236.  In the event MCL 791.236 is amended, the amendment controls and there is no need to update the Agreement.  "Violent felony" includes an arrest for the following Michigan Compiled Law offenses:

| | |
|---|---|
| 750.82 | Feloneous Assault |
| 750.83 | Assault with intent to commit Murder |
| 750.84 | Assault with to cause great bodily harm less Murder (as of April 1, 2013, this includes strangulation and suffocation) |
| 750.86 | Assault with intent to Maim |
| 750.87 | Assault with intent to commit felony |
| 750.88 | Assault with intent to rob and steal Unarmed |
| 750.89 | Assault with intent to rob and stead Armed |
| 750.316 | Murder – 1st Degree |
| 750.317 | Murder – 2nd Degree |
| 750.321 | Manslaughter |
| 750.349 | Kidnapping |
| 750.349a | Prisoner taking a person hostage |
| 750.350 | Leading away, enticing away a child under 14 |
| 750.397 | Mayhem |
| 750.520b | Criminal Sexual Conduct (CSC) 1st Degree |
| 750.520c | Criminal Sexual Conduct 2nd Degree |
| 750.520d | Criminal Sexual Conduct 3rd Degree |
| 750.520e | Criminal Sexual Conduct 4th Degree |
| 750.520g | Assault with intent to commit CSC |
| 750.529a | Carjacking |
| 750.530 | Larceny |

DPD will provide the DNA testing supplies to the MDOC.

### DPD OBLIGATIONS

DPD must:

10. Neither assign this Agreement nor sublet the leased premises in whole or in part.

11. Non-Discrimination - Must comply with the Elliott-Larsen Civil Rights Act, 1976 PA 453, MCL 37.2101 *et seq.*, as amended, and all applicable federal, State and local fair employment practices and equal opportunity laws as amended. DPD agrees not to discriminate against any employee or applicant for employment, with respect to his or her hire, tenure, terms, conditions or privileges of employment or, any matter directly or indirectly related to employment, because of his or her race, religion, color, national origin, age, sex, height, weight, marital status, or physical or mental disability that is unrelated to the individual's ability to perform the duties of a particular job or position. DPD agrees to include in every subcontract entered into, if any, for the performance of this Agreement, this covenant not to discriminate in employment. This covenant is required under the Elliott-Larsen Civil Rights Act, 1976 PA 453, MCL 37.2101, *et seq.* as amended, and the Persons with Disabilities Civil Rights Ace, 1976 PA 220, MCL 37.11011, *et seq.*, as amended and any breach of this provision may be regarded as a material breach of the Agreement.

7

12. Pay for all utilities, maintenance, services, and rent as noted in this Agreement.

13. May display public notifications of applicable meetings, if any, as required by the Open Meetings Act, 1976 PA 267, MCL 15.261 *et seq.*, in public lobby areas of the building where the leased premises are located, in a manner consistent with the décor of the public areas. DPD may display signage in public lobby areas explaining the Citizen Complaint Procedure.

14. May place signage designating the leased premises as the DETROIT DETENTION CENTER (DDC) at its expense with the prior written approval from the MDOC Director.

15. May not permit bicycles, mopeds or other vehicles used for personal transportation to be stored anywhere within the leased premises except they may be stored on the two leased parking lots.

16. Must provide two (2) on-site supervisors assigned to ensure that probable cause hearings are conducted, that probable cause exists for each arrestee, to review and authorize all releases, to maintain documentation relative to probable cause determinations and to coordinate with the MDOC regarding the MDOC's operations under this Agreement.

17. ~~Must coordinate with the 36ᵗʰ District Court personnel and DPD investigative personnel to timely arraign arrestees via video. Arrestees not arraigned within a 72-hour period after booking must be immediately brought to the MDOC's attention and promptly prepared for release by DPD.~~ Nothing in this paragraph should be construed to affect in any manner DPD's legal responsibility, policy, procedure or practice pertaining to its arraignment of arrestees.

18. Promptly after arraignment, ~~DPD will coordinate with the Wayne County Sheriff's Office (WCSO) regarding the transfer of arraigned arrestees to WCSO.~~

19. Must properly search all arrestees before entrance onto the leased premises and ensure arrestees are properly restrained (hand-cuffs, belly-chains, leg-irons, zip-ties/plastic-ties, etc.).

20. Must document all searches of persons in an auditable manner and retain search records. DPD must also at a minimum require all individuals entering the leased premises to pass through a walk-through metal detector/search prior to entrance into the facility. DPD must ensure that the metal detector is properly maintained and is in proper working order.

21. Must fill out the "MDOC/DPD Central Intake Admission Form" for each arrestee. Exhibit 1.

8

~~22. Must provide the following functioning equipment for the operation of the leased premises:~~

   ~~a.~~ No less than five (5) ~~live-scan machines/system~~ for the printing/booking of arrestees;

   ~~b.~~ ~~Video arraignment equipment~~ to conduct arraignments with the court;

   ~~c.~~ Breathalyzer machines for conducting alcohol testing of arrestees;

   ~~d.~~ ~~Audio/video recording equipment;~~

   ~~e.~~ ~~Stationary security video cameras.~~

23. Must develop and implement a procedure to collect and deposit remuneration from arrestees or a legal adult acting on the arrestee's behalf and document the issuance of bonds to arrestees.

24. Must provide major medical treatment for any arrestee requiring, but not limited to hospitalization, ER treatment, transportation by ambulance, EMT assistance, surgery, cancer treatment, etc. whose cost will not be the responsibility of the MDOC. Prior to bringing the arrestee(s) to the DDC, if the arrestee has any injuries, DPD staff must transport of the arrestee(s) to any hospital or make arrangements for transport of the arrestee. If the arrestee is already housed at the DDC and requires transport to a hospital, MDOC staff will accompany the arrestee to the hospital at which time custody of the arrestee will be transferred to the DPD staff assigned to the hospital.

25. Shall be made aware of and not contravene MDOC policy and procedure to ensure a good and efficient working relationship between the parties. The MDOC will furnish its policies and procedures to DPD and DPD is responsible to ensure that its staff has been made aware of MDOC policies and procedures. Any violation or attempted violation of policies, regulations, or work rules including any arrest, criminal conviction(s) and the issuance of a Personal Protection Order (PPO) will be closely scrutinized by the MDOC. DPD must report any incident requiring investigation to the MDOC in writing immediately upon knowledge of the incident. DPD must produce, upon request, any and all records related to any investigation conducted by the MDOC. DPD must also cooperate with the MDOC in any internal investigation conducted by the MDOC regarding the conduct of any arrestee, the DPD or its employees/staff. Failure of DPD to report a violation of policy, to report an attempted violation, or to take appropriate disciplinary action is a material breach of this Agreement as it directly affects the safety and security of the leased premises.

26. Must report all instances of misconduct and discipline involving DPD staff permanently assigned to the facility premises immediately to the MDOC.

9

27. Must have a policy directive consistent with the MDOC's policies on Use of Force and Managing Disruptive Prisoners while escorting arrestees.

28. Must maintain a written contraband control procedure that is consistent with MDOC policies. DPD must utilize a system comparable to the MDOC Gate Manifest to control items coming into the leased premises.

29. Any DPD staff who works simultaneously with or side by side with any MDOC staff does not have any property interest in nor does this create any property right by DPD staff to State employment.

30. Must document all critical incidents consistent with MDOC Policy PD 01.05.120 Critical Incident Reporting. DPD must notify the MDOC of any critical incident immediately in writing.

31. Examination of Records – For seven (7) years after DPD provides any work under this Agreement, the MDOC/State of Michigan may examine and copy any of DPD's books, records, documents and papers pertinent to establishing DPD's compliance with this Agreement and with applicable laws and rules.

32. Must not maintain an arsenal on site.

 33. Will not undertake any renovations or construction on the leased premises without the prior written consent of the MDOC.

34. In the event DPD uses any information technology equipment or peripherals (e.g. computers, switches, routers, printers) connecting to the State of Michigan network, DPD agrees to comply with State of Michigan security protocols. DPD may use and connect to the current wiring in the premises. DPD may use stand alone non-networked equipment procured, maintained and replaced at the sole cost of DPD.

## CONSIDERATION

 35. The cost to DPD for the five year term is Forty-One Million Eighty-Three Thousand and No/100 Dollars ($41,083,000.00) calculated as follows:

36. DPD shall pay a one time fee to the MDOC for the required physical plant changes to the leased premises. This one time physical plant charge to install cameras, fencing and other required physical plant changes is Four Hundred Fifty Thousand Dollars ($450,000.00) due upon commencement of this Agreement and is in addition to the rental payments. The actual cost of: rent of Buildings #100 and Building #500, MDOC custody and security staff, minor medical services and medical staff, all maintenance and janitorial services, use of computer lines, food services for arrestees, their clothing and bedding, all utilities and legal services. This fee is based on a yearly cost of Eight Million One Hundred Twenty-Six

10

Thousand and No/100 Dollars ($8,126,600.00) and will be paid in monthly installments at the rate of Six Hundred Seventy-Seven Thousand Two Hundred Sixteen and 66/100 Dollars ($677,216.66). Occupancy in the middle of a month will be prorated accordingly and rent will be due upon occupancy.

37. Rent payments are due by DPD on the first day of each month and shall be received by MDOC no later than 45 days past the due date. Any payments received past the 45 day deadline will result in interest due to the MDOC as calculated in Detroit Order 42-98, § 1, 12-2-98, Section 18-5-76 Interest on Overdue Payments. Past due payments by DPD are payable at the rate of one-half of one percent (0.5%) of the delinquent payment for the first month and one percent (1%) of the payment for each succeeding month or a portion of each succeeding month that the payment is due. This interest is immediately due and payable to the MDOC – State of Michigan. The MDOC is not required to submit a separate bill, statement or past due notice in order to collect the interest. Rent payments not made within the month due may be considered a material breach of this Agreement. (Pursuant to the City of Detroit Ord. No. 42-98, § 1, 12-2-98, Sec. 18-5-73, it requires contracts to make reference to this ordinance. Every city purchase order or contract shall make reference to this ordinance, and shall contain prominent and specific instructions for the vendor to request payment under the contract.)

38. Payments due by DPD may be increased once per year, each year and adjusted for the actual cost incurred for services provided under this Agreement. If the Legislature passes legislation setting the amount of funds to be paid/appropriated under this Agreement, then the legislation controls. The parties will meet once per year to review costs and payments.

39. Electronic transfer of funds is required for payments on State contracts. DPD must register with the State electronically at http://www.cpexpress.state.mi.us. As stated in 1984 PA 431, MCL 18.1283a, all contracts that the State enters into for the purchase of goods and services must provide that payment will be made by Electronic Fund Transfer (EFT).

### DPD's OPTION TO PURCHASE

40. None.

### WARRANTIES AND REPRESENTATIONS

41. The parties represent and warrant that they are capable in all respects of fulfilling and must fulfill all of its obligations under the Agreement. The performance of all obligations under the Agreement must be provided in a timely, professional and workman-like manner and must meet the performance and operational standards required under the Agreement.

11

42. If, under the Agreement, DPD provides any equipment, software or other deliverables (including equipment, software, licenses and other deliverables manufactured, re-marketed or otherwise sold by DPD or is in DPD's name) then in addition to DPD's other responsibilities with respect to the items in the Agreement, must assign or otherwise transfer to the MDOC or its designees or afford the MDOC the benefits of, any license of and manufacturer's warranty for equipment and software.

43. In addition to any remedies available in law, it is a material breach of this Agreement if either party breaches any of the warranties in this section.

## LIABILITY INSURANCE

44. DPD must provide proof that it has obtained the minimum levels of insurance coverage indicated or required by law.  DPD must maintain all required insurance coverage throughout the term of this Agreement and any extensions.  The MDOC may approve the use of DPD's fully-funded self-insurance program in place of any specified insurance identified in this section.

45. Worker's Disability Compensation Act, 1969 PA 317, MCL 418.101 *et seq.* – Each party must comply with the law.

46. Limitation of Liability – Each party is responsible for the acts or omissions of their respective employees.

## CANCELLATION/TERMINATION

47. If DPD breaches this Agreement and the MDOC determines the breach is curable, then the MDOC must provide DPD with written notice of the breach and a time period (not less than 30 days) to cure the breach.  The notice of breach and opportunity to cure is inapplicable for successive or repeated breaches or if the MDOC determines in its sole discretion that the breach poses a serious and imminent threat to the health or safety of any person or the imminent loss, damage, or destruction of any real or tangible personal property.

48. In the event of a strike or walk-out by employees of DPD or any subcontractor, DPD must continue to provide adequate staffing and resources necessary to perform all obligations under this Agreement.  Failure to do so will be considered a material breach of the Agreement that poses a serious and imminent threat to the health or safety to any person or the imminent loss, damage, or destruction of any real of tangible personal property.

49. This Agreement may be cancelled/terminated in whole or in part by either party if the non-cancelling party is notified in writing at least 180 days prior to the effective date of the cancellation.  The termination notice must specify one of the below listed reasons for the termination:

a. An Executive determination has been made either that the purpose for which the Agreement was entered into no longer exists or that sufficient funds do not exist for meeting the consideration obligations.

b. Damage or destruction is so extensive as to exceed 50% of the replacement value of the leased premises.

c. Termination for convenience.

d. Breach of a material condition.

e. Security Concerns.

f. Non-Appropriation of funds.

g. Bankruptcy.

h. Upon an order of a court with jurisdiction or upon written direction by the federal government.

50. Reservation of Rights – In the event of any full or partial termination of this Agreement, each party reserves all rights or remedies otherwise available to each party.

51. Continued Performance – Each party agrees to continue performing its obligations under this Agreement while a dispute is being resolved except to the extent the issue in dispute precludes performance (dispute over payment must not be deemed to preclude performance) and without limiting the MDOC's right to terminate this Agreement as indicated above.

## NOTICE, APPLICATION, AND APPROVALS

Any notice to the parties required by this Agreement shall be completed if submitted in writing and transmitted by personal delivery (with signed delivery receipt), or certified registered mail return receipt requested. Unless either party notifies the other in writing of a different mailing address, notice to the parties shall be transmitted as noted below. Additionally, pursuant to the City of Detroit Ord. No. 42-98, § 1, 12-2-98, Sec. 18-5-73, it requires contracts to make reference to this ordinance. (Every city purchase order or contract shall make reference to this division, and shall contain prominent and specific instructions to the vendor i) as to the identity of the city employee(s) responsible for monitoring, verifying or accepting the vendor's performance under the contract or purchase order, and ii) as to the procedures, contact person(s), mailing address(es) and time line(s) for the vendor to request payment under the contract.)

13

<u>To the MDOC Contract Monitor or Designee:</u>

Randall W. Treacher, Chief Deputy Director
Michigan Department of Corrections
206 East Michigan Avenue
Lansing, MI 48933
Tel.: (517) 373-2014
TreacherR@michigan.gov

<u>To the DPD Contract Monitor or Designee:</u>

Chester Logan
Interim Detroit Chief of Police
1300 Beaubien
Detroit, MI 48226

52. Notice shall be deemed effective as of 12:00 p.m. Eastern Time Zone on the third business day following the date of mailing, if transmitted by mail.  Business day is defined as any day other than a Saturday, Sunday, legal holiday or day preceding a legal holiday.  A receipt from a U.S. Postal Service, or successor agency, performing such function shall be conclusive evidence of the date of mailing.

53. Any disagreement as to any operation policy or procedure between the MDOC and DPD must be submitted to the Contract Monitors who shall resolve the matter(s).

54. Required Disclosures – Within three (3) days after receiving notice of any pending or threatened action, notice of intent, claim, order, decree, litigation, investigation, arbitration or other alternative dispute resolution proceeding, or any other proceeding by or before any governmental authority, arbitrator, court or administrative agency (collectively "Proceeding") that arises under and during the term of this Agreement, the parties must disclose it to each other including:

    a.  any criminal proceeding involving the parties or any of their respective officers or directors;
    b.  any civil proceeding.

55. DPD is not authorized to accept service of process on behalf of the MDOC, its officials or its employees.

56. MDOC is not authorized to accept service of process on behalf of DPD, its officials or its employees.

14

## MISCELLANEOUS

57. Governing Law - This Agreement shall be interpreted in accordance with the laws of the State of Michigan.

58. Compliance with Laws – The parties must comply with all applicable state and federal laws in the performance of this Agreement.  The parties will comply with the Prison Rape Elimination Act (PREA) standards.

59. This Agreement constitutes the entire agreement between the parties and may be amended only in writing and executed in the same manner as this Agreement was originally executed.

60. Headings and captions – Headings and captions used in this Agreement are for information and organization purposes.  Captions and headings, including inaccurate references, do not, in any way, define or limit the requirement or terms and conditions of the Agreement.

61. Terminology and Definitions – All personal pronouns used in this Agreement whether used in the masculine of feminine or neutral gender, shall include all other genders; the singular shall include the plural and the plural shall include the singular.

62. Survival – The provisions of this Agreement that impose continuing obligations, including warranties and confidentiality will survive the expiration or termination of this Agreement.

63. No Third Party Beneficiaries – It is expressly understood and agreed by the parties to this Agreement that the services provided hereunder are not intended to insure to the benefit or detriment of any third party, including but not limited to arrestees, visitors and volunteers.

64. Relationship of the Parties – The relationship between the parties is that of MDOC lessor/independent contractor and DPD lessee/client.  No agent, employee, or servant of DPD is an employee, agent or servant of the State.

65. No Co-employer/Employee Relationship – DPD must acknowledge that neither this Agreement nor any subsequent amendment creates a co-employer/employee relationship between DPD and the State of Michigan, MDOC, its departments, divisions, agencies, sections, commissions, officers, employees or agents.

66. Smoking/use of tobacco products are prohibited in the leased premises.

67. Covenant of Good Faith – Each party must act reasonably and in good faith. Unless otherwise stated in this Agreement, the parties must not unreasonably delay, condition, or withhold the giving of any consent, decision, or approval that

.is either requested or reasonably required of them in order for the other party to perform its responsibilities under this Agreement.

68. Removal or Re-assignment of Personnel – One party may request to the other party to remove or reassign personnel if it has a legitimate, good-faith reason articulated in its notice. Replacement personnel must be fully qualified for the position. Personnel issues will be brought to both parties supervisors attention immediately. The MDOC reserves the right to deny access to any of DPD's employees or its subcontractors prospective employees, based on the results of an ICHAT background check or for other security reasons. Nothing in this Agreement/paragraph is to be construed as a violation of any collective bargaining agreement.

69. If either party wants to bring a guest(s) through the leased premises, it must first seek and obtain prior written approval from the other party.

70. Either party may use appropriately trained dogs to detect illegal drugs on the premises, employees, visitors, arrestees and property.

71. The parties will establish a written, detailed and uniform escape apprehension plan and for hostage incidents.

72. The parties shall establish a written policy regarding firearms, chemical agents, weapons and Tasers® (electronic control devices/electro-muscular disruptor devices).

73. Media Releases – News releases pertaining to this Agreement and the DDC must not be made without prior State approval and then only by persons authorized by the parties to release information to the press. This provision does not prohibit the parties from issuing joint media releases.

74. Freedom of Information – This Agreement and all information submitted to the State and DPD is subject to the Michigan Freedom of Information Act (FOIA), 1976 PA 442, MCL 15.231 *et seq.*

75. Should any provision of this Agreement or any addenda thereto be found to be illegal or otherwise unenforceable by a court of competent jurisdiction, such provision shall be severed from the remainder of the Agreement and such action shall not affect the enforceability of the remaining provisions of this Agreement.

76. This Agreement is not binding or effective on any party until approved and signed by the parties' duly authorized representative, approved by the Governor and filed with the Office of the Great Seal in the Michigan Department of State and the Wayne County Clerk.

16

77. This Agreement, with all enclosures and attachments, if any are listed below, constitutes the entire Agreement between the parties with regard to this transaction and may be amended only in writing and executed in the same manner as this Agreement was originally executed:

Exhibit 1 – MDOC/DPD Central Intake Admission Form
Exhibit 2 – Outline of Transfer of DPD Arrestees to the MDOC at the DDC
Exhibit 3 - Arrest Exception Form (UF001)

**IN WITNESS WHEREOF,** the parties have executed this agreement by their duly authorized representatives:

**On Behalf of the Michigan Department of Corrections:**

Daniel H. Heyns, Director
Michigan Department of Corrections

4/2/13
Date

**On Behalf of the City of Detroit and the Detroit Police Department:**

Chester Logan
Interim Detroit Chief of Police
Detroit Police Department

Date

Kevin Orr
Emergency Manager
City of Detroit

April 1, 2013
Date

Approved by:

Rick Snyder, Governor of Michigan
(v8, 3-15-2013)

Date

17

**EXHIBIT 1**

**MDOC/DPD CENTRAL INTAKE ADMISSION FORM**

18

**EXHIBIT 2**

## OUTLINE OF TRANSFER OF DPD ARRESTEES TO MDOC AT THE DDC

DPD supervisors will be located in Building #500 to make probable cause determinations as outlined below:

<u>Arrests and Transfer of Custody</u>

1. DPD or MSP officer(s) make an arrest.

2. Either the arresting officer(s) or a transport unit manned by DPD or MSP officers will transport all arrestee(s) to the detention facility, Building #500 for processing.

NOTE: If the arrestee has a serious injury or illness requiring immediate medical attention, Emergency Medical Services (EMS) or DPD officers shall transport the arrestee directly to the hospital for treatment.

3. At the detention facility, the arresting officer(s) prepare the "MDOC/DPD Central Intake Admission Form" noted as **Exhibit 1.**

4. Arresting officer(s) present the arrestee to the DPD supervisor along with the Central Intake Admission Form.  The arresting officer(s) shall brief the DPD supervisor of the circumstances of the arrest.

5. The DPD supervisor(s) will take one of the following actions:
   a. If a determination is made that probable cause for the arrest exists, the DPD supervisor shall sign the admission form section indicating that probable cause exists for the arrest and then the arrestee will be turned over to the MDOC; or

   b. If a determination is made that probable cause for the arrest does not exist, the DPD supervisor will sign the admission form section indicating that probable cause does not exist for the arrest and the supervisor shall ensure the arrestee is released and make arrangements to have the arrestee transported back to the location of the arrest.  The DPD supervisor will then prepare a Review of Arrest Exception Form (UF001).  **Exhibit 3.**

6. If a Breathalyzer test is required to be given to the arrestee due to the nature of the arrest, DPD staff will conduct the test in the intake/processing area after a determination has been made by a DPD supervisor that probable cause exists for the arrest.

7. If arrestees are not arraigned within 72 hours of arrest, DPD will process them for immediate release.

19

**EXHIBIT 3**

**ARREST EXCEPTION FORM (UF001)**

DocuSign Envelope ID: 307669FE-84B3-4A91-AA0F-7E255E09C16D

## THIRD AMENDMENT TO INTERAGENCY AGREEMENT BETWEEN THE CITY OF DETROIT/DETROIT POLICE DEPARTMENT AND THE MICHIGAN DEPARTMENT OF CORRECTIONS FOR THE DETROIT DETENTION CENTER

This is the Third Amendment to the Interagency Agreement between the City of Detroit/Detroit Police Department ("DPD") and the Michigan Department of Corrections ("MDOC") dated April 2, 2013 with a First Amendment finalized on August 5, 2013 and a Second Amendment executed on July 31, 2018.

The parties agree as follows:

1. The parties have agreed to allow the DPD to exercise a one-year option extending the original interagency agreement to July 31, 2019, subject to the terms of the Second Amendment executed July 31, 2018, while the Parties negotiate a longer-term agreement for the property.

2. The DPD acknowledges that the original Interagency Agreement monthly rental payments may be increased/adjusted for actual cost. The parties agree to the following payments schedule for the remainder of the one-year extension period:

   December 1-15, 2018 $338,608.33
   December 16-31, 2018 $389,200.00
   January 1, 2019 - July 31, 2019 $727,808.33/month

3. The DPD also acknowledges and agrees that proposed property improvements including HVAC, parking lot repair and replacement, and fencing will not occur unless and until the Parties execute a new agreement replacing the current Interagency Agreement.

THIS AGREEMENT SHALL BECOME EFFECTIVE UPON EXECUTION BY BOTH REPRESENTATIVES AND MAY BE EXECUTED IN COUNTERPART.

ON BEHALF OF THE MICHIGAN DEPARTMENT OF CORRECTIONS:

_____          11/7/18
Heidi E. Washington, Director               Date

**REVISED EXHIBIT 2**
**TRANSFER OF ARRESTEES TO MDOC AT THE DDC**

<u>Arrests and Transfer of Custody</u>

1. Michigan State Police (MSP) Troopers, Motor Carrier Officers or DNR officers (hereinafter referred to as arresting officer(s)) are authorized to lodge any person arrested in Wayne County or any person arrested on a warrant originating out of a Wayne County district or circuit court in the DCC.

2. The arresting officer(s) will transport all arrestees to the DCC, enter through Building #100 and proceed to Building #500 for processing.

3. If the arrestee has a serious injury or illness requiring immediate medical attention, Emergency Medical Services (EMS) or the arresting officer(s) shall transport the arrestee directly to the hospital for treatment.

4. At the detention facility, the arresting officer(s) shall prepare either the "MDOC/DPD Central Intake Admission Form" noted as Exhibit 1, or an intake form regularly used by the MSP in the performance of their duties.

5. The arresting officer(s) shall present the arrestee to MDOC personnel for the booking process. The arresting officer(s) shall inform the MDOC supervisor of any unusual circumstances of the arrest and/or any known risks/threats involving the arrestee.

6. All property on the arrestee's person shall be secured by MDOC. The MDOC will be responsible for transfer of property taken from arrestee during intake back to arrestee upon release from custody, release upon posting bond, or transfer to WCSO for post-arraignment detention.

7. Any contraband located during search shall be turned over to the arresting officer(s).

8. If a breath alcohol test is required to be given to the arrestee due to the nature of the arrest, the arresting officer will conduct the test.

9. Once the arrestee is turned over to MDOC personnel for booking, the arrestee will be searched, fingerprinted utilizing LiveScan, and photographed digitally.

    a. Utilizing LiveScan, all arrestees shall be checked against known fingerprint records (AFIS).
    b. If the identity of an arrestee comes into question during the LiveScan process, MDOC personnel shall immediately notify the arresting agency.
    c. Photographs shall be immediately submitted to the SNAP database.

10. If arrestees are not arraigned within 72 hours of arrest, the MDOC will process them for immediate release.

3

This First Amended Agreement incorporates the balance of the original Agreement, constitutes the entire Agreement between the parties and may be amended only in writing and executed in the same manner as originally executed.

IN WITNESS WHEREOF, the parties have executed this Amendment by their duly authorized representatives:

**On Behalf of the Michigan Department of Corrections:**

_____        7/19/13
Daniel H. Heyns, Director                 Date
Michigan Department of Corrections

**On Behalf of the City of Detroit/Detroit Police Department:**

_____        8/6/13
Kevyn Orr                                 Date
Emergency Financial Manager
City of Detroit

_____

The Balance of this Page is Intentionally Left Blank

A P P R O V E D
JUL 2 3 2013
CHIEF OF POLICE

4

INTERAGENCY AGEEMENT
BETWEEN
THE CITY OF DETROIT/DETROIT POLICE DEPARTMENT
AND
THE MICHIGAN DEPARTMENT OF CORRECTIONS
FOR THE
CITY OF DETROIT DETENTION CENTER

**First Amendment to the Agreement signed and entered into by the Parties on April 2, 2013.  The changes are:**

1.      Paragraph 8 (TERM) is amended to read:

"The MDOC shall furnish the leased premises with its appurtenances to the DPD for a five (5) year, eleven day initial term of possession commencing July 21, 2013 and ending on July 31, 2018.  During July 2013, the MDOC staff will work with DPD staff to ensure the installation and functioning of the video equipment, the cameras, booking software and the computers.  The MDOC will charge DPD for the month of July 2013, only the actual cost of MDOC staff with no utility costs, the MDOC will start accepting arrestees as of August 1, 2013.

This Agreement may, at the option of the parties be extended for two (2), one-year (1) options, under the same terms and conditions except for the rent as noted in the Consideration Section, provided notice is given in writing to the MDOC no less than 120 days before the expiration of the Agreement."

2.      Paragraphs 35 and 36 (CONSIDERATION) are amended to read:

35. "The cost to DPD for the five year term is Forty-One Million Five Hundred Sixteen Thousand Eight Hundred Forty and No/100 Dollars ($41,516,840.00), calculated as follows:

36. DPD shall pay no more than $233,840.00 for MDOC actual staffing costs only (and excludes utility costs) for the period of July 21, 2013 through July 31, 2013. The actual staff costs will be billed to DPD on August 1, 2013.

DPD shall pay a one-time fee to the MDOC for the required physical plant changes to the leased premises.  This one-time physical plant charge to install cameras, fencing and other required physical plant changes is Six Hundred Fifty thousand ($650,000.00), $450,000.00 which is due and payable August 1, 2013. The balance of $200,000.00 is due and payable September 1, 2013.

The yearly rental rate of Eight Million One Hundred Twenty-Six Thousand and No/100 dollars ($8,126,600.00) will be paid in monthly installments at the rate of

Six Hundred Seventy-Seven Thousand Two Hundred Sixteen and 66/100 Dollars ($677,216.66).  This fee is for the cost of rent for Building #100 and Building #500, MDOC custody and security staff, minor medical services and medical staff, all maintenance and janitorial services, use of computer lines, food services for arrestees, their clothing and bedding, all utilities and legal services.

For illustration and to clarify, the billings for months of July through October 2013 are:

| July 21 - 31, 2013: | $233,840.00 | staff costs only |
|---|---|---|
| August 1 – 31, 2013: | $450,000.00 | construction costs |
| | $677,216.66 | rent |
| | $1,127,216.66 | |
| September 1 – 30, 2013: | $200,000.00 | balance of construction costs |
| | $677,216.66 | rent |
| | $877,216.66 | |
| October 1 – 31, 2013: | $677,216.66 | rent." |

3.      Paragraph 76 is amended to read:

"This Agreement is not binding or effective on any party until approved and signed by each party's duly authorized representative."

4.      Paragraph 77, Exhibit 2 is amended in full, replaces "Exhibit 2" in its entirety and the title reads:

"Exhibit 2 – Transfer of Arrestees to MDOC at the DDC."

{01420207.DOCX}

# EXHIBIT 4

# STATE OF MICHIGAN

Contract No. 210000000685
Prisoner Health Care and Pharmacy Services

## SCHEDULE A
## STATEMENT OF WORK
## CONTRACT ACTIVITIES

This schedule identifies the anticipated requirements of this. The term "Contractor" in this document refers to Grand Prairie Health Services, P.C..

**BACKGROUND**
This Contract is for an Integrated Care Management Model that addresses the general health, psychiatric health, and medication needs of prisoners and delivers a full range of medically necessary services to prisoners under the jurisdiction of the MDOC in a cost-effective manner. The delivery of these services must be in compliance with MDOC policies, procedures and protocols. If any applicable MDOC policy or procedure for a particular type of treatment provides for a lesser degree of care than good and acceptable medical standards, then such good and acceptable medical standard shall take precedence. If any applicable MDOC policy or procedure establishes a higher standard of care than good and acceptable medical standards, then such MDOC policy or procedure shall take precedence.

It is anticipated the contract effective date will be April 14, 2021. Although the contract effective date is April 14, 2021, the Contractor must begin providing all services, without interruption on September 29, 2021. The period between April 14, 2021 through September 28, 2021 will be for transition and implementation; no payment will be made to the Contractor during this period. The State reserves the right to change, as necessary.

The Michigan Department of Corrections (MDOC), Bureau of Health Care Services (BHCS) continually evaluates and modifies its service delivery system to incorporate preventive health, population health and care management models that have been successful outside corrections in improving outcomes and reducing costs. By doing so, prisoner health outcomes improve, and recidivism is reduced. BHCS also continually tailors its approach to working with the larger health and human service delivery system - ensuring linkages are developed that are critical to reducing recidivism.

The MDOC currently contracts for general health care, psychiatric health care, and pharmaceutical services to an average of 32,500 prisoners annually at correctional facilities, reentry centers, and some county jails. This number includes prisoners from other jurisdictions (such as federal and county prisoners). The Contractor must provide services to all populations included on the MDOC Client Census.

The MDOC operates the Duane L. Waters Health Center (DWHC), an inpatient facility in Jackson, MI, which houses prisoners whose medical needs cannot be met at an infirmary or ambulatory clinic. DWHC provides acute, medical, long term care, and surgical procedures that are non-invasive or use conscious sedation. Attached to DWHC is C Unit, which houses prisoners that are not to the level of needing inpatient services nor can their needs be met in an ambulatory facility. C Unit has 94 medical beds. DWHC currently has two procedure rooms, an on-site emergency room staffed 24 hours, seven days per week and a specialty clinic. Staffing for the emergency room includes MDOC paramedics, nurses and a medical provider. The Contractor is responsible for providing the medical provider coverage. As a rule, prisoners must be housed within 90 miles of DWHC to receive services from the specialty clinics held at DWHC. At DWHC there are students from various universities who provide optical services on-site. The Contractor will be responsible for maintaining and managing these university relationships.

Approximately 26% of the prisoner population is currently being treated at some level for mental health challenges. A larger percentage of prisoners may receive mental health treatment during their incarceration, but many prisoners move on and off of the mental health caseload. The MDOC operates a 200-bed inpatient facility in Whitmore Lake, MI (Woodland Correctional Facility (WCC)) that houses prisoners with severe mental illness whose needs cannot be met in a general population facility. This facility also houses the Crisis Stabilization Program which stabilizes prisoners in need of emergency mental health care.

In addition to mental health services, each newly committed prisoner is assessed for a presence of a substance abuse disorder at a reception facility. This also includes any prisoner returning to incarceration. Diagnostic

20

on-site unit at WHV. Dialysis services must be available on-site a minimum of six days per week from 6:00 a.m. to 11:00 p.m. EST.  The MDOC reserves the right to add or remove facilities offering the dialysis services. The Contractor is responsible for ensuring there is a pre-approved dialysis unit contingency plan in place to allow dialysis services to continue if there is a full or partial failure of the on-site dialysis unit(s).  The Contractor's initial contingency plan must be pre-approved in writing by the MDOC Program Manager or designee prior to the contract effective date.  Any changes to the contingency plan must be pre-approved in writing by the MDOC Program Manager or designee throughout the term of the contract.  The contingency plan must include, but is not limited to, how, where, and when the Contractor will source necessary equipment on-site, any established relationships to provide the contingency services, timeframes that would be involved in getting equipment running on-site, a certification that the dialysis operation meets all Dialysis community operation standards, etc.

i.      Youthful Offenders – The youthful offender program is a collaborative effort actively involving MDOC custody, general and psychiatric healthcare, and education staff to meet the need of adolescent prisoners. This specialty service is primarily housed at the Thumb Correctional Facility (TCF) in Lapeer, MI. It is composed of elements including alternatives to segregation for youth prisoners, and the Behavior Management Unit with programming related to education, group treatment, and employment. The age range for participation is 13 to 21 at the time of the offense. The Contractor must provide medical and psychiatric services to prisoners in this program.

j.      Detroit Detention Center (DDC) – The MDOC has an agreement with the City of Detroit/Detroit Police Department (DPD) to provide custody and security services to arrestees housed at DDC (formerly the Mound Correctional Facility).  The MDOC will maintain custody of arrestees age 17 or older (up to 200 arrestees) and house them 24 hours/day, 7 days per week, 365 days per year while the arrestees await processing, booking court appearance or transport.  The detention shall not exceed 72 hours from the time of booking.

        1)      The Contractor will be responsible for providing medical provider to provide on-site minor medical treatment and medication to arrestees with minor injuries/ailments.

        2)      The Contractor will not be responsible for major medical treatment for any arrestee, requiring, but not limited to hospitalization, ER treatment, transportation by ambulance, Emergency Medical Technician (EMT) assistance, surgery, cancer treatment, etc.

k.      Optical Services –This specialty service is provided in each clinic. Patients receive an initial exam upon intake through Contractor's staff.  The Contractor must provide these services through a visiting specialist. MDOC is responsible for providing the eyeglasses and contact lenses only when approved by the CMO or the Assistant Chief Medical Officer-Primary Care (ACMO-PC), along with the optometry equipment. The Contractor is responsible for providing optical providers.

l.      OB/GYN Services – The Contractor must provide standard outpatient level services at WHV including but not limited to: colposcopy, Loop Electrosurgical Excision Procedure (LEEP), ultrasounds, endometrial biopsy, cervical punch biopsy, excision of polyps, and treatment of venereal warts with either chemical cauterization or excision PAP smears.

m.      Substance Use Disorder Treatment Program – MDOC is developing a comprehensive SUD treatment program that will include evidence-based screening and assessment of opioid use disorder, access to all three forms of FDA-approved medications for addiction treatment, individual, group, and

28

**Contract Purchase Agreement : 2884051  Change Order : 6**
**Date :** 03/05/2016

*To*                    :

Company     STATE OF MICHIGAN
Contact

Address     DEPT OF CORRECTIONS
            STEPHEN T MASON BLDG 3RD ST
            LANSING, MI 48913

**CITY of DETROIT**

*From*                   :

Company     City of Detroit
Contact     LaTonia Stewart-Limmitt
Address     2 WOODWARD AVENUE
            STE 1100
            DETROIT, MI 48226
            UNITED STATES

Phone

Fax

E-mail

This document has important legal consequences. The information contained in this document is proprietary of the City of Detroit. It shall not be used, reproduced, or disclosed to others without the express and written consent of the City of Detroit.

This amendment supersedes the agreement 2884051 and all its prior modifications.

Contract 2884051, Amendment 4 with State of Michigan, Dept. of Corrections for additional costs of $44,217,000 for a total contract cost of $94,265,173.28, to provide housing for prisoners at the Detroit Detention Center, for the extended period through July 31, 2024, as requested by Police, was approved by City Council on Nov. 26, 2019.

_____
.

This contract modification is effective as of  **12/06/2019**.

**Chief Procurement Officer**

*Bonjier Jackson*

Office of Contracting and Procurement
Proprietary and Confidential